NO. 07-05-0087-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

DECEMBER 29, 2006
_____

ANIBAL HERIBERTO VALLE,

Appellant

v.

THE STATE OF TEXAS,

Appellee
_____

FROM THE 31ST DISTRICT COURT OF WHEELER COUNTY;

NO. 3972; HON. STEVEN R. EMMERT, PRESIDING
_____

*Opinion*
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Anibal Heriberto Valle (appellant) appeals his conviction for possessing approximately 30 pounds of marijuana. The contraband was found within a pallet of corn flour. The corn flour was being hauled in a trailer of an eighteen wheeler along with other cargo. Appellant drove the eighteen wheeler. The six issues before us concern the legal and factual sufficiency of the evidence supporting his conviction. We reverse and remand.

*Applicable Law*

When both the legal and factual sufficiency of the evidence is challenged, the former must be addressed first. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App.1996). Next, in determining issues of legal sufficiency, we ask if, after reviewing all of it in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense to exist beyond a reasonable doubt. *Evans v. State*, No. PD-1911-05, 2006 Tex. Crim. App. LEXIS 1815 (Tex. Crim. App. September 20, 2006); *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005). Moreover, evidence contradicting the verdict is ignored, *Saxer v. State,* 115 S.W.3d 765, 769 (Tex. App.–Beaumont 2003, pet. ref'd), and disputes involving the credibility of witnesses are left to the jury to resolve. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).

On the other hand, we view the evidence in a neutral light when assessing its factual sufficiency. *Watson v. State*, 204 S.W.3d 404, ___ (Tex. Crim. App. 2006). Our role is akin to sitting as "a thirteenth juror," but only "to a very limited degree." *Id.* Being so restricted, however, we may not simply substitute our perception of the evidence for that of the jury. *Id.* Rather, the tenor of the record must leave us with "a high level of skepticism about the jury's verdict" before we can reject it. *Id.* That is, we must "be able to say, with some objective basis in the record" either that the great weight and preponderance of the evidence (though legally sufficient) contradicts the verdict or that the evidence supporting conviction is so weak that the verdict "seems 'clearly wrong and manifestly unjust[.]'" *Id.*, *quoting Johnson v. State*, 23 S.W.3d 1 (Tex. Crim. App. 2000).

2

So too must it be remembered that evidence comes in many forms, two of which are direct and circumstantial. Both are probative and merit consideration. And, so long as it is admissible and of sufficient quantum, either can support the verdict. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Indeed, there are times when the only evidence indicative of guilt is circumstantial, such as in cases like that at bar. For instance, to secure a lawful conviction, it was encumbent upon the State to prove appellant exercised control, management, or care over the substance while knowing it to be contraband. *Poindexter v. State*, 153 S.W.3d at 405-06 (describing the elements of the crime at issue as exercising control, management, or care over the contraband while knowing it to be contraband). While the record at bar is replete with *direct* evidence of the first element (as evinced by appellant driving the contraband across country), no such evidence illustrates that he knew of the marijuana.

So, the legitimacy of the verdict depends upon whether the *circumstantial* evidence appearing of record and reasonable inferences therefrom were enough to support conviction. Making this assessment is rendered a bit more difficult when, as here, the drugs were not found on the accused's person or in areas within his exclusive control. In all cases, the accused must be linked to the drugs. Establishing that link is quite easy when the substances are found on his person for it is reasonable to infer that people know what they have on their person. But, when the contraband is elsewhere or in a locale over which the suspect does not have sole control, then the distance that is created in the link

3

must be bridged. In building that bridge, we consider numerous indicia or links.[1] Furthermore, each serves as a pillar, and there must be enough in place to span the gap and tie the drugs to the accused. This does not mean that all the pillars must be in place. *Evans v. State*, *supra.* Rather, there need only be enough to make the jump. Or, in legal jargon, the logical force emanating from the links must enable a jury to rationally infer, beyond reasonable doubt, that the element of the crime in dispute existed. *See id.* (noting that the logical force, or lack thereof, emanating from those links found to exist is determinative).

The aforementioned indicia or links consist of such things as whether 1) the accused was present when the search was conducted, 2) the contraband was plainly visible by those present, 3) the drugs were near the defendant, 4) the defendant was under the influence of the substance found, 5) the defendant possessed other contraband or drug paraphernalia when arrested, 6) the defendant uttered any incriminating statements, 7) the defendant attempted to flee or undertook other acts indicating a consciousness of guilt, 8) the defendant made furtive gestures, 9) the contraband emitted a recognizable odor at the time, 10) other contraband or drug paraphernalia was present, 11) the defendant had the right to exclusive or joint possession of the locale at which the drugs were found, 12) the place where the drugs were found was enclosed, 13) the amount of contraband discovered, and 14) the accused was familiar or had experience with drugs. *Evans v. State, supra*. By no means is this list exclusive; there may be others. But, again,

---

[1]Though the indicia were once characterized as "affirmative links," we now simply refer to them as links. *Evans v. State*, No. P.D.-1911-05, 2006 Tex. Crim. App. LEXIS 1815 n.9 (Tex. Crim. App. September 20, 2006).

irrespective of which are used, the force of their sum at bar must have been enough to lawfully permit the jury to infer (beyond reasonable doubt) that appellant knew of the drugs he was transporting.

*Application of Law*

*Record Evidence*

Viewing the record evidence, we note the following.  The 30 pounds of marijuana was divided into 22 packets and placed in one box.  The packets were either lined or sprinkled with lotion and pepper, set upon a pallet, and surrounded with sacks of corn flour.  The sacks of flour, some individually wrapped in plastic and others wrapped in packets of ten, covered not only the sides of the box but its top as well.  Then, the pallet, along with three others containing sacks of flour (wrapped in packets of ten) were loaded into the trailer.  Who wrapped the flour and stacked it on the pallets does not appear of record.  Nor does the record disclose whether or not the box was inserted before or after the pallets of flour were loaded.  One of the testifying officers (who had experience as a trucker) did opine, though, that truck drivers do not load their cargo; others do it for them.  And, this testimony comports with that of appellant for he said he remained in the truck's sleeper unit while third parties loaded the cargo.  Yet, irrespective of who loaded the pallets of flour or when the marijuana was hidden within it, whoever did so also placed cardboard atop each pallet to cover it.

Next, to reach the flour, one of the arresting officers had to climb over two other pallets.  These contained sacks of charcoal also wrapped in plastic.  Furthermore, the charcoal was stacked high enough to leave only a small crawl space between it and the trailer's roof.  Additionally, both the pallets of charcoal and flour were placed at the front

5

of the trailer; so too did they fill only about a quarter of the available space. The remainder of the trailer was empty. With the trailer being loaded in that manner and lacking internal lights, the contents within it were not easily visible, according to an officer.

Of note was the testimony that flour and charcoal were "absorbents." Being such, the officers opined that they (along with the lotion and pepper) can be used by drug traffickers to mask odor which drugs may emit. This may be why neither officer could smell the marijuana themselves. Instead, it took a drug dog to discover the scent. Yet, whether charcoal and flour had the same absorbing properties when wrapped in plastic went unaddressed.

According to the record, the officers first encountered appellant as he drove the eighteen wheeler from California down I-40 and through Wheeler County. According to them, he owned the truck tractor while someone named Ramos owned the trailer. Furthermore, he had been given the job of transporting several cars from California back to his home state of North Carolina. Because the cars were not ready for transport when appellant arrived in California, he was directed to pick up other loads, those loads being the corn flour and charcoal in question.

As appellant purportedly made his way back to North Carolina, an officer stopped him as part of a routine inspection. During the stop, appellant gave the officer two documents representing the contents of his trailer. One (pertaining to the charcoal) was a form bill of lading the blanks of which having been completed in handwriting. The other (pertaining to the flour) was an electronically printed cash receipt. They both had the name, street address and phone number of the business at which the particular commodity

6

was acquired.[2] The appearance of the bill of lading seemed odd to the officer since he opined that most were now completed electronically. Yet, he admitted that there was nothing illegal in a bill being completed by hand. So too was the receipt deemed odd, given that it did not appear to be a bill of lading but rather a cash sales receipt. According to the officer, cargo was generally paid for via credit not cash. Nevertheless, no one opined that it was illegal to acquire cargo that had been paid for in cash. Nor did either of the testifying officers opine that appellant was the one who actually paid for the corn flour or that he ever had an amount of money on him sufficient to pay for it. They simply concluded that someone had to pay for it.

Though an officer made effort, at one time or another, to verify the identity of the name of the contact person (Juan) mentioned on both documents, he met with little success. He did talk with people at the establishments but his attempt to fax the documents to them per their request went for naught; the fax numbers purportedly were inoperative. And, his subsequent phone calls either went unanswered or resulted in a busy signal.

That appellant's signature appeared on neither the bill nor receipt was another cause for concern mentioned by at least one officer. He opined that truck drivers usually sign such documents upon receiving the cargo.

As for the conduct of appellant during the stop and ensuing search, both officers stated that he was cooperative and calm. He answered their questions, consented to a

---

[2]An officer testified that no street address appeared on the corn flour receipt. One need only read the document to see that he was mistaken. Furthermore, should the address be "googled," one would discover that the address is tied to the business name appearing on the receipt.

7

search of the vehicle, and voluntarily unlocked the cargo doors to permit it. Furthermore, when the drugs were ultimately discovered appellant revealed no marked change in his demeanor, according to one officer. The other, however, contradicted this testimony by describing that appellant acted in "disbelief." How this supposed disbelief was evinced went unmentioned. So too did this officer opine that acting in disbelief is often an attempt to mask guilt, but, he did not say how he interpreted appellant's reaction. Nor did he provide the jurors with any indicia which they could use to determine its sincerity.[3]

Next, after appellant authorized the officers to search the tractor and trailer, one walked his drug dog around the vehicle. The animal "hit" twice. The first occurred as it sniffed around a drain in the trailer. That drain was in the vicinity of the flour stored inside. The second "hit" occurred once the dog entered the trailer itself; it led to the discovery of the box hidden within the flour. No other contraband was discovered in the trailer or truck, though. Nor were drugs or drug paraphernalia found on appellant's person. And, when asked, the officers disclosed that appellant did not appear to be under the influence of any illegal substance.

As previously mentioned, the cargo filled only a small portion of the trailer. This led one of the officers to wonder why appellant locked the cargo doors. He allegedly knew of instances where more sizeable amounts of cargo where left behind unlocked doors when being hauled around. Yet, the officer also opined that a truck "driver is responsible for the

---

[3]It is interesting how easily evidence of demeanor can be manipulated to mean just about anything. Some suggest that nervousness indicates guilt. Others find culpability in a suspect's calmness. Should he cooperate with law enforcement or consent to a search, then that simply means (as one officer insinuated here) he is setting himself up to later feign surprise and innocence. But, if the suspect were to be uncooperative or refuse to permit a search, then he must be hiding something, some would say. Interesting, indeed.

8

load." And, another acknowledged that the doors may have been locked simply as a security measure to protect the cargo.

Next, the size of the lawful cargo and the distance being traveled (from North Carolina to California then back to North Carolina) caused an officer to wonder about the profitability of the trek, and he mentioned this to the jury. Yet, nowhere in the record do we find evidence that appellant's pay was dependent upon or linked to the quantum of property hauled. Rather, it illustrates that he had leased the truck to another (Carlos Ramos of Wilson, N.C.) in return for receiving a certain income based upon miles driven. In short, he was paid by the mile, not the load, and no one contested this.

That appellant had originally been sent to retrieve cars also seemed unusual to the officers. This was so because the trailer was a refrigerated unit or "reefer," and they purportedly were not designed to transport vehicles. Nonetheless, one officer conceded that he had "seen . . . in the past" reefers being used for such purposes. Moreover, neither officer addressed whether the unit being pulled by appellant was somehow modified to allow the transportation of motorized vehicles.

Next, the topic of appellant's presence when the cargo was being loaded was broached. One of the officers attested that he "believe[d]" appellant told him he (appellant) was "present" during that time. The same officer later conceded to defense counsel that appellant never "indicated where he was when these were loaded." The other officer commented, though, that because truck drivers were "responsible" for the cargo, they normally supervised its loading and signed the bills of lading. But, as previously mentioned, he also opined that drivers were not responsible for packing the commodities being shipped. So too did he acknowledge that a driver could simply back his trailer to the

9

loading dock, have others load it, receive a "cash ticket," and go "to the next place." The latter likened to the method appellant indicated that he followed; again, he allegedly remained inside his truck's sleeper while others placed the cargo in the trailer.

Next, an officer testified that appellant had approximately $700 on his person when stopped. Whether this sum of money was unusual for a trucker driving cross-country went undeveloped. Nonetheless, appellant informed the jury that he was given $1200 in advance to pay for the expenses of the trip. Moreover, the State calculated, through a witness, that the gas expense alone in going from North Carolina to California and then back approximated $550 to $600.

Other evidence appearing of record consisted of an officer suggesting that appellant failed to inform him of the flour shipment when asked about what he carried; allegedly appellant simply mentioned the charcoal. Yet, a written report filed by the officer revealed that appellant had indeed told him of both commodities before the search began. Next, one or the other officer conceded that he found no indication of appellant being in the trailer, that appellant's fingerprints were not found on the contraband, that appellant never refused to talk with them, that appellant denied having narcotics or other contraband in the vehicle, that there existed a language barrier between the officers and appellant,[4] that appellant uttered no incriminating statements, and that appellant's travel log disclosed no unusual stops. Finally, when asked to name the indicia he perceived that suggested appellant knew about the drugs, the officer who initially detained and interrogated appellant and eventually found the marijuana replied: "I guess I couldn't honestly answer that."

---

[4]Appellant was a resident of the United States from Guatemala and spoke Spanish.

Comparison of the foregoing evidence to the links mentioned in *Evans* leads us to the following observations. First, appellant was at the scene when the contraband was discovered by the officers. Second, the contraband was not in plain view but hidden within an enclosed space. Third, no one could place appellant on the loading dock or near the cargo as it was being loaded. Fourth, appellant had access to the contraband given his control over the trailer and possession of the keys for the lock on the cargo doors; yet, nothing indicated that he was ever in the trailer. Fifth, though the contraband may have been accessible by appellant through effort, no evidence indicates that it was ever within close proximity to him. Sixth, while appellant carried a large sum of money on him, nothing indicates that the sum was unusually large for a cross-country trucker to have while performing his job. Seventh, to the extent that marijuana emitted an odor, it took a drug dog to notice it. Eighth, neither drugs nor drug paraphernalia was found on appellant; nor did he appear to be under the influence of any narcotic or contraband. Ninth, other than the 30 pounds of marijuana hidden within the flour, no drugs were found elsewhere. Tenth, appellant did not act nervous, though he may have evinced "disbelief" when the drugs were discovered according to one of the two officers. Eleventh, appellant made no effort to escape, committed no furtive gesture, nor uttered any conflicting or incriminating statement. Twelfth, though the amount of contraband was rather sizeable, it nonetheless was small enough to be hidden within a pallet of flour. Thirteenth, no one observed appellant in a suspicious place under suspicious circumstances. Fourteenth, appellant may have deviated, in some respects, from what the officers perceived to be normal shipping procedures when acquiring his loads. Fifteenth, there was little profit to be made in shipping the quantum of charcoal and flour discovered in the trailer. Sixteenth, though

11

the bill of lading and cash receipt were deemed suspect by the arresting officers, the officers never determined whether they were issued by someone other than the companies and individuals mentioned thereon. Seventeenth, there is no evidence that appellant had any experience with drugs, knew what they looked like, or knew how they were shipped. Eighteenth, once appellant locked the trailer and left the loading docks, he had exclusive control of its contents.

*Legal Sufficiency*

Given the foregoing litany, it appears that the links favoring the verdict are appellant's relative accessibility to the contents of the trailer, his possession of $700, his presence when the officers found the drugs, his *potential* deviation from procedures other truckers may follow, the relative unprofitability of shipping the small amount of cargo, the amount of the contraband hidden in a pallet of flour, and his exclusive control over the freight once the trailer was locked and he left the loading docks. To them we add the evidence that the entire cargo consisted of products having the purported ability to absorb smells, that reefers were not designed to carry vehicles, that the officers had difficulty in confirming the identity of the contact persons whereat appellant acquired his cargo, that one could notice a difference in the way the flour on the pallet containing the marijuana was packaged, and that appellant distanced himself from the cargo as it was loaded. When that evidence is construed in a light most favorable to the verdict and contradictory evidence is ignored, we deem there is enough to bridge the gap between appellant and the drugs. In other words, there was some evidence permitting a rational jury to conclude beyond reasonable doubt that he not only exercised control over the marijuana (by hauling across country) but did so knowing it was within his control.

12

*Factual Sufficiency*

Yet, our job is not over. Again, appellant questioned the factual sufficiency of the evidence. And, as previously mentioned, addressing that issue obligates us to consider the entirety of the evidence in a neutral light. Thus, we need not ignore the fact that the officers were not qualified by the State as or otherwise shown to be experts on the matter of commercial trucking procedures or the conduct of commercial truckers. Nor must we ignore the fact that in commenting about the ability of charcoal and flour to absorb odors, the officers were again not shown to have any specialized training in the matter. Nor can it be forgotten that neither they nor the State explained what effect plastic wrapping had on the ability of charcoal and flour to absorb smells. Moreover, in reading the testimony of the officers, one is left with the unmistakable impression that whatever conduct a suspect engages in, they can interpret it as indicative of criminality. To that we add 1) the numerous links (discussed above) that weigh against there being a nexus between appellant and the contraband, 2) one officer's own testimony that he has seen reefers being used to haul cars, 3) another's testimony that a trucker may simply drive up to a loading dock, remain in the truck, have others load the goods, obtain whatever receipt is given him, and then drive off, 4) the inability of the officers to confirm whether or not the contact person named on the bill of lading and receipt worked for the companies at which the goods were received, 5) the lack of evidence suggesting that appellant had any experience in or history with the drug trade, 6) the absence of evidence contradicting appellant's version of how he came to acquire the limited cargo he had, and 7) the inability of one officer to place appellant inside the trailer and of the other to inform the jury of any indicia he thought was enough to show appellant knew of the drugs.

13

Into the mix we throw in another observation. The circumstances before us are unlike those involved in the usual drug stop. We do not have an individual simply operating a vehicle on a public roadway. We have a person whose job it is to transport, over long distances, property belonging to third parties. Moreover, if the officers at bar are to be believed, the property is most likely packaged by third parties, as opposed to the driver. This is a setting ripe for the *unwitting* carriage of illegal goods. Consequently, both jurors and the judiciary must tread cautiously to avoid convicting the unwitting.

In sum, while an abundance of information floats around in the record it means little when placed in context. It may be (as the officers suggested) the responsibility of a long-haul driver to exercise care over his cargo but not even the law of bailments equates the duty of care with a knowledge of content. To say otherwise would be to divine apples from oranges. And, that appears to be a general flaw running throughout the case. Tidbits of information were tossed before the jury but there lacked a cohesive thread tying them together. This is not to say that the State's effort was less than noteworthy. Rather, it connotes the difficulty in proving guilt in cases such as this.

So, from the totality of the evidence when considered in a neutral light, we can say that objective basis exists of record upon which to find "the evidence supporting conviction [to be] so weak that the verdict "seems 'clearly wrong and manifestly unjust[.]'" *Evans v. State*, *supra.* To the extent that the dissent disagrees, we note that the two cases it relies on, *Menchaca v. State*, 901 S.W.2d 640 (Tex. App.–El Paso 1995, pet. ref'd) and *United States v. Garza*, 990 F.2d 171, 174 (5th Cir. 1993), are inapposite. For instance, *Menchaca* involved drugs being transported within a car as opposed to being hidden within the cargo

14

of a trailer hauled by a common carrier. Nor do we have here evidence of nervousness on the part of the driver or a document indicating how and where the drug deal would be completed, unlike the situation in *Menchaca*. As for *Garza,* the court also had before it indicia absent here. They included 1) nervousness and trembling on the part of the courier, 2) a false bill of lading hidden in the truck, 3) admission by the courier of falsification of his log book along with an implausible explanation, 4) suspicious circumstances involving Garza's delayed departure and 5) abandonment of his unlocked truck for a time. But, most importantly, neither opinion dealt with the factual, as opposed to legal, sufficiency of the evidence. This is of import because evidence that is legally sufficient to support a verdict does not *ipso facto* mean it is factually sufficient.[5]

Accordingly, we overrule appellant's issue regarding the legal sufficiency of the evidence but sustain that involving the factual sufficiency of the evidence illustrating appellant's knowledge of the contraband. So too do we reverse the judgment and remand the cause for further proceedings.

              Brian Quinn
              Chief Justice

Publish.

---

[5]This truism further illustrates the problem with the factual sufficiency analysis. While the evidence being legally sufficient does not mean it is factually sufficient, the line between the two becomes more oblique given such recent cases as *Watson v. State*, 204 S.W.3d 404 (Tex. Crim. App. 2006). Appellate courts are informed that they are to play some role as a thirteenth juror but not really and that they must be highly skeptical about the verdict, not just skeptical. So too must an objective basis be found before holding the evidence factually sufficient, but whether the objectivity of the jurist when considering the evidence must be that simply of a reasonable judge is unknown. And, if it is to be simply that of a reasonable judge, it cannot really be said to differ much from that of the reasonable judge of the facts, *i.e.* a juror. So, maybe then, the jurist's viewpoint should be that of the highly skeptical reasonable judge. As oft stated by a colleague "whatever . . .!" In any case, it may be time for either the Court of Criminal Appeals or legislature to reconsider the viability of the doctrine. *Watson* comes close to, but falls short of, doing away with it, and, instead, leaves us with nebulous parameters to use in guiding our journey. Jurors should be left to do their job. And, if the evidence legally supports what they did, then all should accept it.

15