

**NUMBER 13-05-715-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JAIME VILLARREAL LOPEZ,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

**On appeal from the 263rd District Court of Harris County, Texas.**

---

# O P I N I O N

### Before Justices Yañez, Rodriguez, and Garza
### Opinion by Justice Yañez

A jury found appellant, Jaime Villarreal Lopez, guilty of possession with intent to deliver cocaine weighing at least 400 grams.[1]  The jury assessed punishment at 25 years in prison and a fine of $250,000.  In two issues, Lopez argues that the evidence is legally

---

[1] *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112 (Vernon 2003).

and factually insufficient to support his conviction.  We affirm.[2]

## I. BACKGROUND

Sergeant Oscar Ortegon, supervisor of the Houston Police Department's Target Narcotic Enforcement Team ("TNET"), received intelligence regarding an individual named Refugio Cosio.  Deputy Gary Dearmon was a member of TNET and was employed by the Harris County Sheriff's Department ("the HCSD").  Sgt. Ortegon instructed Deputy Dearmon to set up undercover surveillance outside of Cosio's residence because possible narcotics trafficking may have been occurring there.  While conducting surveillance on the morning of July 17, 2004, Deputy Dearmon observed Cosio leaving his residence in a Jeep; he then pursued Cosio in an unmarked vehicle.  In the course of his pursuit, Deputy Dearmon observed Cosio engage in the following activity.

Cosio first drove to a taqueria stand, where he talked for 15 to 20 minutes with an individual driving a Lincoln Navigator; this individual was later identified as Jesus Alvarado.  Cosio then drove to a Walgreens, where he got out of his Jeep and began talking with an unidentified male driving a red truck.  Cosio took the man's truck and drove it to "the Staghill residence."  He entered the residence and remained there for 10 to 20 minutes.  He then drove the truck back to the Walgreens and, after conversing briefly with the same unidentified male, swapped vehicles again.  Cosio then drove the Jeep to the taqueria stand and spoke briefly with Alvarado.  Cosio subsequently drove to a Kroger's shopping center, where he circled the parking lot a few times, but never exited his vehicle.  He then drove to a McDonald's.

---

[2] Lopez's appeal was transferred to this Court from the Fourteenth Court of Appeals.

Upon Cosio's arrival at the McDonald's, Lopez exited the McDonald's and spoke with Cosio in the parking lot for five to 15 minutes. Deputy Dearmon testified that, upon observing Cosio and Lopez as they conversed, it appeared to him as if they both knew each other and that their conversation was friendly. When the conversation concluded, Cosio drove away in a Mitsubishi Lancer. Deputy Dearmon followed Cosio when he left the McDonald's, but soon decided to abandon the effort because he feared Cosio would detect his presence. He believed, however, that Cosio was driving to the Staghill residence; the residence was one to two miles from the McDonald's and authorities suspected that it was a stash house.[3] Deputy Dearmon returned to the McDonald's because he believed Cosio would also return there. As he waited for Cosio to return, Deputy Dearmon observed Lopez sitting inside the McDonald's with another individual; this individual was later identified as Javier Ruiz, Lopez's father-in-law. After being gone approximately 30 to 45 minutes, Cosio returned to the McDonald's. Cosio, Lopez, and Ruiz then met in the parking lot where they briefly conversed. Cosio then drove away in the Jeep and Lopez and Ruiz drove away in the Lancer, which they co-owned.

According to Deputy Dearmon, Lopez and Ruiz's exchange of vehicles with Cosio was an odd act for law-abiding citizens, but common conduct for drug traffickers. Sgt. Ortegon provided the jury with the following explanation as to why drug traffickers switch vehicles:

> Vehicle switch is, first and foremost, it's a collateral where one subject will leave his vehicle in assurance to the other subject that he's going to

---

[3] According to Sgt. Ortegon, a "stash house" is a location in which narcotics are stored until they are disseminated to individual buyers. Testimony revealed that at some point after Lopez's arrest, authorities entered the Staghill residence and uncovered drug paraphernalia, which included ledgers, money counters, rubber bands, and Food Saver vacuum seal bags.

return with his vehicle.

Then once they switch vehicles, one is taken off and it's loaded with the various narcotics. And then it's returned back, and then they make the switch.

What that does is, one, it assures that he's going to come back with his vehicle.

And, two, it prevents the disclosure of the location where they're getting the narcotics from, where it's being stored, where it's being housed until it's disseminated.

So—and that in and of itself protects the other side of the subject so that they're not getting robbed. So that somebody isn't there to rob them and steal their narcotics or to steal their money that they have.

According to his testimony, Sgt. Ortegon believed that Lopez switched vehicles with Cosio for the above reasons. His testimony was supplemented by Deputy Dearmon, who, on direct examination, explained the role he believed Lopez played in the purported drug transaction:

Q:    Okay. And, so, would you agree with me that Lopez and Ruiz are probably a little bit lower in the [drug] organization than Cosio?

A:    I would agree with that, yes.

Q:    Based on what?

A:    Based on what I actually saw out there. Obviously, there was no money exchanged that we knew of. We didn't see it.

But based on my experience, many times individuals are tasked with just picking up a load of illegal narcotics and delivering it to another location. And for lack of a better word, many times it's just referred to in the drug business as mules. They were responsible for—for moving it from one location to another location.

Deputy Dearmon did not follow Cosio out of the McDonald's, but began to pursue Lopez and Ruiz, instead. While following them, Deputy Dearmon contacted Deputy Steve

4

Shaddox of the HCSD. He directed Deputy Shaddox, who was driving a patrol vehicle, to the Lancer's location and instructed him to look for any type of traffic infraction that would provide probable cause to stop the Lancer. Deputy Shaddox stopped the Lancer after its driver committed an unsafe lane change. He approached the Lancer's passenger side, where he observed Ruiz sitting in the driver's seat and Lopez in the front passenger seat. Upon approaching the vehicle, Deputy Shaddox noticed that Lopez's hands and arms were "trembling." According to Deputy Shaddox, Lopez "appeared to be upset by [his] presence" and "appeared to be overly nervous." Deputy Shaddox asked Ruiz for his driver's license and insurance, but Ruiz had neither. As a result, Ruiz was arrested and placed in the backseat of the patrol vehicle. Deputy Shaddox subsequently asked Lopez for his driver's license and insurance, but Lopez had neither. Deputy Shaddox then asked if there were any weapons or narcotics in the Lancer; Lopez stated that there were none. Lopez and Ruiz were both asked if they would consent to the Lancer being searched and both gave their consent orally and in writing.

The search was conducted by Deputy Wallace Wyatt of the HCSD, who arrived on the scene at the time Ruiz was being placed in Deputy Shaddox's patrol vehicle. Prior to the search, Lopez was placed in the backseat of Deputy Wyatt's patrol vehicle. Deputy Wyatt searched the driver and passenger compartments, but found nothing. He then opened the trunk and saw two large duffle bags; upon inspection, he concluded that the bags contained cocaine. Deputies Wyatt and Dearmon both testified that the cocaine emitted a strong odor, which they smelled upon opening the trunk.

Deputy Wyatt subsequently transported Lopez to jail, where he was detained for further investigation. While being transported to jail, Lopez began to speak, prompting

5

Deputy Wyatt to turn on an audio recording device. The jury listened to the recorded conversation and was provided with a transcript of the recording, which contained the following:

DEPUTY WYATT: YOU HOT?

LOPEZ: WHO POINT THE FINGER?

DEPUTY WYATT: WHAT?

LOPEZ: WHO POINT THE FINGER?

DEPUTY WYATT: WHAT DO YOU MEAN "PUT THE FINGER?"?

LOPEZ: SOMEBODY POINT THE FINGER

DEPUTY WYATT: LIKE "POINT THE FINGER" WHAT DO YOU MEAN?

LOPEZ: NO...SOMEBODY PUT THE....WHOSE THAT?

Deputy Wyatt testified that, from his past experience, Lopez's question—"Who point the finger?"—meant "who told on me or who knew I was dealing the drugs, taking the drugs somewhere and told you to stop me."

Lopez's fingerprints were not found on the duffle bags. An investigation of the duffle bags' contents revealed that each bag contained 25 bricks of cocaine, which had a combined weight of 48.6 kilograms (approximately 107.14 pounds). Deputy Dearmon testified that the wholesale value of a kilogram of cocaine was between $13,000 and $15,000; under this estimate, the wholesale value of 48.6 kilograms of cocaine would be between $630,500 and $729,000. Sgt. Ortegon testified that a kilogram of cocaine had a street value of $100,000; under this estimate, the street value of 48.6 kilograms of cocaine would be $4,860,000.

Lopez did not present a defense.

6

## II. APPLICABLE LAW

In cases involving unlawful possession of a controlled substance, the State must prove that the accused intentionally or knowingly exercised actual care, custody, control, or management over the substance and that the accused knew the matter possessed was contraband.[4] Possession of contraband need not be exclusive and evidence which shows that an accused jointly possessed the contraband with another is sufficient.[5] Whether the theory of prosecution is sole or joint possession, the evidence must link the accused to the contraband in such a manner and to such an extent that a reasonable inference may arise that the accused knew of the contraband's existence and that he had possession of it.[6] The evidence, be it direct or circumstantial, must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous;[7] the evidence must generate more than a strong suspicion or mere probability of guilt.[8] Courts require the State to satisfy this evidentiary burden in order to protect the innocent bystander—a relative, friend, or even stranger to the actual possessor—from conviction merely because of his fortuitous proximity to someone else's drugs.[9] Accordingly, mere

---

[4] *Acosta v. State*, 752 S.W.2d 706, 707 (Tex. App.–Corpus Christi 1988, pet. ref'd).

[5] *Martin v. State*, 753 S.W.2d 384, 387 (Tex. Crim. App. 1988).

[6] *Lassaint v. State*, 79 S.W.3d 736, 740 (Tex. App.–Corpus Christi 2002, no pet.).

[7] *Poindexter v. State*, 153 S.W.3d 402, 405-06 (Tex. Crim. App. 2005). Until recently, this principle was referred to as the "affirmative links rule," terminology that has been abandoned in favor of simply referring to the evidentiary "links" between the accused and the contraband. *See Evans v. State*, 202 S.W.3d 158, 162 n.9 (Tex. Crim. App. 2006) (noting "'affirmative' adds nothing to the plain meaning of 'link'" and court will henceforth "use only 'link'").

[8] *Grant v. State*, 989 S.W.2d 428, 433 (Tex. App.–Houston [14th Dist.] 1999, no pet.).

[9] *Poindexter*, 153 S.W.3d at 406.

7

presence in the vicinity of contraband that is being used or possessed by others does not, by itself, support a finding that the accused is a joint possessor or a party to the offense.[10] Along the same line, mere presence does not make an accused a party to joint possession even if the accused knows of the existence of the contraband and has knowledge of an offense.[11]

When an accused is not in exclusive possession of the place where the contraband is found, it cannot be concluded or presumed that the accused had knowledge of or control over the contraband unless there are additional independent facts and circumstances connecting or linking the accused to the knowing possession of the contraband.[12] Similarly, when the contraband is not found on the accused's person or it is not in the exclusive possession of the accused, additional independent facts and circumstances must link the accused to the knowing possession of the contraband.[13]

Several factors may help to establish a link between the accused and the contraband, including, among others, the following: (1) whether the contraband was in plain view or recovered from an enclosed place; (2) the accused was the owner of the premises or had the right to possess the place where the contraband was found, or was the owner or driver of the automobile in which the contraband was found; (3) the accused was found with a large amount of cash; (4) the contraband was conveniently accessible

---

[10] *See, e.g., Harvey v. State*, 487 S.W.2d 75, 77 (Tex. Crim. App. 1972).

[11] *Allen v. State*, No. 03-04-00557-CR, 2008 Tex. App. LEXIS 1709, at *24 (Tex. App.–Austin Mar. 7, 2008, no pet. h.).

[12] *Lassaint*, 79 S.W.3d at 740.

[13] *Id.*

to the accused, or found on the same side of the vehicle as the accused was sitting; (5) the contraband was found in close proximity to the accused; (6) a strong residual odor of the contraband was present; (7) the accused possessed other contraband when arrested; (8) paraphernalia to use the contraband was in view, or found on the accused; (9) the physical condition of the accused indicated recent consumption of the contraband in question; (10) conduct by the accused indicated a consciousness of guilt; (11) the accused attempted to escape or flee; (12) the accused made furtive gestures; (13) the accused had a special connection to the contraband; (14) the occupants of the premises gave conflicting statements about relevant matters; (15) the accused made incriminating statements connecting himself to the contraband; (16) the quantity of the contraband; and (17) the accused was observed in a suspicious area under suspicious circumstances.[14]

There is no established or set formula of factors that would dictate a finding of a link to support a reasonable inference of knowing possession of contraband.[15] One reason for this is that a factor that contributes to the sufficiency of evidence that the accused possessed contraband in one case, may be of little or no value in a different case.[16] Though the number of factors is not as important as the logical force the factors have in establishing the elements of the offense,[17] it is seldom that any one factor will have the logical force sufficient to sustain a conviction based on constructive possession of

---

[14] *Id.* at 740-41.

[15] *Allen*, 2008 Tex. App. LEXIS 1709, at *29 n.13.

[16] *See id.*

[17] *Evans*, 202 S.W.3d at 166; *Lassaint*, 79 S.W.3d at 741.

9

contraband.[18]   Ultimately, the question of whether the evidence is sufficient to link the accused to the contraband must be answered on a case-by-case basis.[19]

### III. LINKS BETWEEN LOPEZ AND THE COCAINE

In *Ruiz v. State*, the First Court of Appeals rejected a legal and factual sufficiency challenge raised by Lopez's father-in-law, Javier Ruiz, who was separately tried and convicted for possessing the cocaine found in the Lancer.[20]  In finding that a link between Ruiz and the cocaine existed, the court considered the amount of the cocaine that was recovered from the trunk,[21] as well as the following facts and circumstances:

> (1) Cosio talked to [Ruiz] and Lopez in the McDonald's parking lot, where they exchanged something, and Cosio left McDonald's driving the Lancer, consistent with drug trafficking; (2) Lopez and [Ruiz] did not appear to order any food while at McDonald's, but seemed only to be waiting for Cosio's return; (3) Lopez and [Ruiz] met Cosio in the McDonald's parking lot when Cosio returned, where the three conversed, they exchanged something again, and Lopez and [Ruiz] got into the Lancer to drive away; (4) [Ruiz] and Lopez did not have their licenses or vehicle registration, which is common with drug dealers who do not want to be detected; (5) the certified public document from the Texas Department of Transportation regarding the registered owners of the Lancer showed that [Ruiz] and Lopez owned the car together; and (6) cocaine has a very strong odor, even if sealed, and the odor was immediately noticeable and overwhelming to Deputy Wyatt.[22]

Unlike in *Ruiz*, there is no testimony in the instant case to establish that (1) both Lopez and Ruiz talked with Cosio when he initially arrived at the McDonald's (testimony established

---

[18] *Allen*, 2008 Tex. App. LEXIS 1709, at *29 n.13.

[19] *Lassaint*, 79 S.W.3d at 741.

[20] *Ruiz v. State*, No. 01-06-00018-CR, 2006 Tex. App. LEXIS 10318, at *4 (Tex. App.–Houston [1st Dist.] Nov. 30, 2006, no pet.) (mem. op., not designated for publication).

[21] *Id.* at *10.

[22] *Id.* at *13

that only Lopez initially met and spoke with Cosio); (2) Cosio made any hand-to-hand exchanges with either Lopez or Ruiz; (3) Lopez and Ruiz did not appear to order any food while at the McDonald's; or (4) the failure of Lopez and Ruiz to carry their driver's licenses and vehicle registration was behavior consistent with drug dealers who wished to avoid detection.[23]

Many of the evidentiary factors traditionally used to establish a link between an accused and the contraband are not present in this case: (1) Lopez was not found with a large amount of cash; (2) the contraband was not conveniently accessible to Lopez;[24] (3) the contraband was not in close proximity to Lopez;[25] (4) Lopez did not present other contraband when arrested; (5) paraphernalia to use the contraband was not in view, or found on Lopez; (6) Lopez's physical condition did not indicate recent consumption of the contraband in question; (7) Lopez did not attempt to escape or flee; (8) Lopez did not make any furtive gestures;[26] (9) Lopez did not have a special connection to the contraband; (10)

---

[23] Assuming, arguendo, that there was testimony to establish the latter two points, we would still have immense difficulty affording any weight to this testimony. First, the testimony at trial established that Deputy Dearmon followed Cosio when he left the McDonald's in the Lancer, thus leaving no law enforcement agents to watch Lopez and Ruiz at the McDonald's. Lopez and Ruiz remained unobserved at the McDonald's for a few minutes until Deputy Dearmon returned to wait for Cosio. Based on these facts, it is hard to exclude the possibility that Lopez and Ruiz ordered food at the McDonald's—a fast-food establishment—and consumed it prior to Deputy Dearmon's return. Second, the notion that Lopez and Ruiz did not possess their licenses and vehicle registration to avoid detection is dubious considering that they willingly and truthfully provided their names and dates of birth when giving written consent for the search of their vehicle.

[24] "The term 'conveniently accessible' means that the contraband must be within the close vicinity of the accused *and easily accessible while in the vehicle* so as to suggest that the accused had knowledge of the contraband and exercised control over it." *Robinson v. State*, 174 S.W.3d 320, 326 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd) (emphasis added). In the present case, the cocaine was not accessible to Lopez, who was sitting in the passenger compartment.

[25] *See Jenkins v. State*, 76 S.W.3d 709, 717 (Tex. App.–Corpus Christi 2002, pet. ref'd) (finding that contraband found in vehicle's trunk was not in close proximity to the accused, who was a front seat passenger).

[26] "Furtive" gestures are generally defined as those which are surreptitious, underhanded, or done by stealth. WEBSTER'S COLLEGIATE DICTIONARY 474 (10th ed., Merriam-Webster, Inc. 1993).

Lopez and Ruiz did not give conflicting statements; and (11) Lopez was not observed in a suspicious area.[27]

We also find that two additional factors—"a strong residual odor of contraband was present" and "the contraband was in plain view or recovered from an enclosed space"[28]—are also not present in this case. First, we afford no weight to any testimony relating to the cocaine's odor because Deputies Wyatt and Dearmon testified that they only smelled the cocaine once the trunk was *open*. At no time did either of them testify that the odor of the cocaine was detectable while sitting in the Lancer's front-passenger compartment with the doors and trunk closed, nor did either testify that Lopez opened the Lancer's trunk after Cosio returned the vehicle.[29] There was also no evidence that Lopez recognized the smell of cocaine.[30]

Second, though the cocaine was found in an enclosed space (i.e., the Lancer's trunk),[31] we believe that no weight should be afforded to this fact. Though there are a

---

[27] *See Lassaint*, 79 S.W.3d at 740-41.

[28] *See id.*

[29] *See Mar v. State*, 814 S.W.2d 898, 900 (Tex. App.–San Antonio 1991, no pet.) (discounting officer's testimony that drugs discovered within a vehicle's trunk smelled, because the vehicle contained a partition between the trunk and passenger compartment); *see also Oaks v. State*, 642 S.W.2d 174, 177 (Tex. Crim. App. 1982) ("The appellant was standing either six to eight inches or two feet from the trash can where the heroin was found. . . . The majority of the Court of Appeals concluded the heroin was in plain view from appellant's location. This is not supported by the evidence. No one placed himself in appellant's position and stated that he could see the heroin in the trash can from that location."); *Allen*, 2008 Tex. App. LEXIS 1709 at *38 (recognizing that officer's testimony that he was able to locate cocaine on top of a refrigerator did not prove that the cocaine was in plain view of appellant, given that she was only seen in the living room and she was seven inches shorter than the officer).

[30] *See Reyes v. State*, 575 S.W.2d 38, 40 (Tex. Crim. App. [Panel Op.] 1979); *Armstrong v. State*, 542 S.W.2d 119, 120 (Tex. Crim. App. 1976); *Mar*, 814 S.W.2d at 900.

[31] *See Hudson v. State*, 128 S.W.3d 367, 374 (Tex. App.–Texarkana 2004, no pet.) (finding trunk of vehicle an enclosed space).

12

number of cases that have treated the fact that contraband was found in an enclosed space within a vehicle as a link between the accused and the contraband, these cases have involved instances in which the duration of the contraband's presence in the enclosed space was unknown. In the instant case, the State implicitly asked the jury to find that Cosio placed the cocaine in the Lancer's trunk during the time Lopez was observed at the McDonald's; we presume that the jury made this finding.[32] There was no evidence that Lopez ever opened the trunk when Cosio returned to the McDonald's in the Lancer. Under these circumstances, the fact that the cocaine was found in the trunk—even when viewed in the light most favorable to the verdict—cannot possibly assist a rational fact-finder in arriving at the conclusion that Lopez had knowledge of the cocaine's presence in the trunk.

The only remaining factors listed in *Lassaint* that appear to be present are the following: (1) Lopez was an owner and occupant of the vehicle containing the contraband; (2) Lopez's conduct (i.e., nervousness) indicated a consciousness of guilt; (3) Lopez made incriminating statements connecting himself to the contraband; (4) Lopez was in a vehicle that contained a large quantity of contraband; and (5) Lopez, though not observed in a suspicious place, was observed under suspicious circumstances.[33] With regard to the first listed factor, we observe that because Lopez and Ruiz both occupied the Lancer when the cocaine was discovered, the fact that Lopez owned and occupied the Lancer cannot, by

---

[32] It is in the State's benefit that we presume the jury made this finding. If we presume otherwise, the State's theory of what transpired at the McDonald's ceases to make sense, and it becomes immensely difficult to understand how Lopez's loaning of the Lancer to Cosio establishes his knowledge of drug activity and, as a result, the cocaine.

[33] *See Lassaint*, 79 S.W.3d at 740-41.

itself, permit a conclusion or presumption that he knew of the cocaine's presence.[34] Additional independent facts and circumstances must exist in order to link Lopez to the cocaine.[35] Consequently, our legal and factual sufficiency review involves determining whether the remaining four factors create the additional independent facts and circumstances necessary for linking Lopez to the cocaine.

## IV. LEGAL SUFFICIENCY

### A. Standard of Review

In his first issue, Lopez argues that the evidence is legally and factually insufficient to prove that he knowingly exercised care, custody, control, or management of the cocaine, or that he knowingly possessed the cocaine. When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[36] The "reasonable alternative hypothesis" analysis for reviewing the legal sufficiency of circumstantial evidence has been abandoned.[37] The consequence of this "is that each defendant must still be affirmatively linked with the drugs he allegedly possessed, but this link need no longer be so strong that it excludes every other outstanding reasonable hypothesis except the defendant's guilt."[38]

In addressing a legal sufficiency challenge, we review all the evidence in the light

---

[34] *See id.* at 740.

[35] *See id.*

[36] *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005).

[37] *Sonnier v. State*, 913 S.W.2d 511, 516 (Tex. Crim. App. 1995).

[38] *Brown v. State*, 911 S.W.2d 744, 748 (Tex. Crim. App. 1995).

14

most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict.[39] It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.[40] We must consider all the evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider.[41]

## B. Discussion

In order to establish that Lopez had knowledge of the cocaine found in the Lancer, the State presented the jury with the theory that both Lopez and Cosio knowingly participated in a drug transaction at the McDonald's. This theory was predicated on the jury inferring that Cosio placed the cocaine in the trunk while Lopez remained at the McDonald's. We believe the jury could have reasonably made this inference upon hearing that (1) TNET had intelligence on Cosio that tied him to possible drug trafficking; (2) prior to his initial arrival at the McDonald's, Cosio was observed engaging in suspicious activity that was consistent with drug trafficking behavior; (3) prior to his initial arrival at the McDonald's, Cosio visited the Staghill residence, a suspected stash house where drug paraphernalia was later discovered; (4) Cosio's act of arriving at the McDonald's in the Jeep and departing in the Lancer reflected the sort of vehicle switching that drug traffickers engage in for the purpose of transferring contraband from one party to another; and (5) Deputy Dearmon testified that he strongly believed that Cosio had driven the Lancer to the

[39] *See Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007).

[40] *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

[41] *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

15

Staghill residence, which was only one to two miles away from the McDonald's.[42]

The State's theory also required the jury to infer that Lopez knowingly allowed Cosio to temporarily possess the Lancer for the purpose of placing cocaine within it. When the evidence is construed in a light most favorable to the verdict, we deem that the jury could have reasonably made such an inference. Because Lopez co-owned the Lancer and was the only owner who conversed with Cosio before he took possession of the vehicle, the jury could have concluded that Cosio had to acquire Lopez's consent to leave the McDonald's in the Lancer. The jury could have then determined that the only plausible reason Lopez would have allowed Cosio to take sole possession of the Lancer, when Cosio's Jeep appeared operable, was to engage in a drug transaction. This was the only explanation the jury was provided. Furthermore, the jury was told that the cocaine's wholesale value was between $630,500 and $729,000. The jury could have concluded that Cosio would not have placed such valuable cargo in Lopez's possession, while leaving him ignorant of all details surrounding his responsibility and the importance of the cargo in his care.[43] Lastly, the jury could have concluded that Lopez knew of the cocaine's presence upon finding that (1) his nervous demeanor evidenced a consciousness of guilt,[44] and (2) his

---

[42] See *Hooper*, 214 S.W.3d at 16 (stating that an inference is a conclusion reached by considering other facts and deducing a logical consequence from them, and noting that juries are permitted to draw multiple reasonable inferences from either direct or circumstantial evidence).

[43] *See United States v. Del Aguila-Reyes*, 722 F.2d 155, 157 (5th Cir. 1983); *Menchaca v. State*, 901 S.W.2d 640, 652 (Tex. App.–El Paso 1995, pet. ref'd); *Castellano v. State*, 810 S.W.2d 800, 806 (Tex. App.–Austin 1991, no pet.).

[44] *See James v. State*, No. 01-06-00496-CR, 2008 Tex. App. LEXIS 545, at *10 (Tex. App.–Houston [1st Dist.] Jan. 24, 2008, no pet. h.) (recognizing that it is within the jury's province to conclude that the accused's nervousness was due to a consciousness of guilt, rather than something else); *but cf. Lassaint*, 79 S.W.3d at 744 (declining to find, in the course of a legal sufficiency review, that the accused—a passenger in a vehicle stopped by law enforcement—demonstrated a consciousness of guilt through his nervousness, because the evidence established that the accused was also cooperative).

16

question to Deputy Wyatt—"Who point the finger?"—was an incriminating statement connecting him to the cocaine, as interpreted by Deputy Wyatt.

In light of the jury's ability to make the aforementioned inferences,[45] as well as the evidence establishing that Lopez occupied and owned the Lancer when the cocaine was discovered—we deem there was some evidence permitting the jury to reasonably conclude beyond a reasonable doubt that Lopez had knowledge of the mere *presence* of cocaine, and that he had knowledge of his *possession* of cocaine.[46]

## V. FACTUAL SUFFICIENCY

### A. Standard of Review

In his second issue, Lopez argues that the evidence is factually insufficient to prove that he knowingly exercised care, custody, control, or management of the cocaine, or that he knowingly possessed the cocaine. When reviewing the factual sufficiency of the evidence to support a conviction, we review all the evidence in a neutral light, favoring neither party.[47] We then ask (1) whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the jury's verdict seems clearly wrong or manifestly unjust, or (2) whether, considering conflicting evidence, the jury's verdict is

---

[45] We find that the jury reasonably made the necessary inferences based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *See Hooper*, 214 S.W.3d at 16-17.

[46] *See United States v. Williams-Hendricks*, 805 F.2d 496, 501 (5th Cir. 1986) ("As the owner of the truck, Hendricks had control over who used it and how it was used. Hendricks allowed Williams to drive the truck back to the United States and accompanied him on the trip. When considered with other evidence in this case, control over the vehicle where contraband is found is sufficient evidence by which a jury could infer that Hendricks possessed the marijuana."); *Sendejo v. State*, 841 S.W.2d 856, 860 (Tex. App.–Corpus Christi 1992, no pet.).

[47] *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).

17

against the great weight and preponderance of the evidence.[48] An appellate court judge cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, she would have voted to acquit had she been on the jury.[49] Nor can an appellate court declare that a conflict in the evidence justifies a new trial simply because it disagrees with the jury's resolution of that conflict.[50] Nevertheless, though due deference must be given to the fact finder's determinations—particularly those concerning the weight and credibility of the evidence—the reviewing court may disagree with the result in order to prevent a manifest injustice.[51]

The court of criminal appeals has stated that "[w]hile alternative hypotheses may be a factor in conducting a factual sufficiency review," it has "never held that the old outstanding reasonable hypothesis test must be satisfied for the evidence to be factually sufficient."[52] As explained by the Dallas Court of Appeals in *Richardson v. State*:

> [A] reviewing court conducting a factual sufficiency analysis necessarily considers any reasonable alternative reasonable hypotheses raised by the evidence. The very nature of a factual sufficiency review requires the court to consider all of the evidence presented at trial and not just that which is favorable to the verdict. Therefore, if the evidence suggests the existence of a reasonable alternative reasonable hypothesis, the court cannot ignore it and still properly perform the analysis required under *Clewis*. However, the mere existence of an alternative reasonable hypothesis does not render the evidence factually insufficient. . . . [E]ven when an appellant identifies an alternative reasonable hypothesis raised by the evidence, the standard of

---

[48] *Watson*, 204 S.W.3d at 414-15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

[49] *Watson*, 204 S.W.3d at 417.

[50] *Id.*

[51] *Johnson*, 23 S.W.3d at 9; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

[52] *Goodman v. State*, 66 S.W.3d 283, 298 (Tex. Crim. App. 2001).

18

review remains the same.[53]

## B. Discussion

While viewing the evidence in a neutral light does not alter the cumulative force of the evidence permitting the fact-finder to infer that Cosio placed the cocaine in the Lancer, it does diminish the strength of the link establishing Lopez's knowledge of the cocaine.

### 1. Suspicious Activity at the McDonald's

Because weighing the factual sufficiency of the evidence obligates us to consider the entirety of the evidence in a neutral light, we need not ignore that (1) there are numerous links, discussed above, that weigh against there being a nexus between Lopez and the cocaine; (2) there is no evidence that Lopez had any previous involvement with drug trafficking; (3) TNET had intelligence tying Cosio to drug trafficking, but no intelligence involved Lopez; (4) there is no evidence that Lopez was aware of Cosio's driving activity prior to Cosio's initial arrival at the McDonald's; (5) there is no evidence that Lopez had ever met or spoken with Cosio prior to their observed conversations at the McDonald's;[54] (6) there is no evidence that Lopez and Cosio were discussing anything relating to contraband at the McDonald's;[55] (7) there is no evidence that Lopez knew where Cosio had driven the Lancer; and (8) Deputy Dearmon and Sgt. Ortegon testified that it was possible

---

[53] *Richardson v. State*, 973 S.W.2d 384, 387 (Tex. App.–Dallas 1998, no pet.); *see generally Harris v. State*, 133 S.W.3d 760, 763-65 (Tex. App.–Texarkana 2004, pet. ref'd); *Orona v. State*, 836 S.W.2d 319, 322 (Tex. App.–Austin 1992, no pet.).

[54] On cross-examination, Deputy Dearmon and Sgt. Ortegon both acknowledged that it was possible that Lopez and Cosio were meeting at the McDonald's for the first time. Deputy Dearmon acknowledged that he did not have any evidence of a longstanding relationship between Lopez and Cosio.

[55] When asked on cross-examination whether Lopez and Cosio could have been discussing "something completely innocent," Deputy Dearmon responded, "I have no idea what they said, sir."

that Lopez lent the Lancer to Cosio for innocent reasons, and that Lopez did not know Cosio would place contraband in the vehicle. These facts cut into a fact-finder's ability to conclude that Lopez allowed Cosio to take possession of the Lancer because Lopez was knowingly participating in a drug transaction.

## 2. Quantity of Contraband

With regard to the quantity of contraband, we note that the contention that a contraband's monetary value can create an inference of knowledge has been criticized.[56] Nevertheless, even if we embrace the contention, and thus conclude that Cosio would not have placed valuable cargo in the Lancer without its owner's knowledge, no evidence excludes the possibility that Cosio made his actions known to Ruiz, but not Lopez. In fact, Sgt. Ortegon acknowledged that it was possible that Ruiz knew Cosio, but Lopez did not.

---

[56] In *Del Aguila-Reyes*, Justice Rubin's dissent criticized the majority's use of the contention, stating:

> My brethren infer guilt from the value of the cargo and the supposition that the owner of so precious a store of contraband would not likely entrust it to an innocent. I do not know how the minds of narcotics dealers work, but the inference that dupes who are unaware that they carry valuable cargo are less likely to steal it than witting accomplices appears to me equally tenable.

722 F.2d at 158 (Rubin, J., dissenting). In *United States v. Littrell*, 574 F.2d 828 (5th Cir. 1978), the Fifth Circuit rejected the government's attempt to use the value of contraband to infer knowledge:

> It is entirely possible that Littrell did not know the cocaine was in the car. The government suggested at oral argument that such an interpretation is not reasonable because a drug "boss" would not entrust delivery of several thousand dollars worth of cocaine to someone who did not know of its presence or who did not know of the drug operation itself. This analysis has two critical flaws. First, drug bosses come in all shapes and sizes and come from all walks of life. Here, that boss may have been a respected businessman who dealt in cocaine "on the side." For all we know, Littrell could have been one of his "legitimate" employees, and the "boss" would have every reason to trust him. Second, we can hardly presume that Littrell knew of the drug operation; indeed, it might be an asset for such a courier to be uninformed about the nature of his delivery, since he would have no reason to be nervous or apprehensive about a task he believed to be perfectly legitimate. Thus, Littrell may simply have been an unknowing "runner" in the delivery process.

*Id.* at 832-33.

20

### 3. Consciousness of Guilt:  Nervousness

We next recognize that Lopez's nervousness creates a tenuous link between him and the cocaine.  In *Lassaint v. State*, Lassaint argued that there was legally insufficient evidence to support his conviction for possession with intent to deliver.[57]  At trial, a police officer testified that before he discovered the contraband allegedly possessed by Lassaint, he observed that Lassaint was nervous.[58]  In weighing that testimony, this Court noted that though "[e]xcessive nervous behavior and unsettled demeanor may be examples of consciousness of guilt[,] [t]he courts have recognized . . . that nervousness is a tenuous link to the contraband because most people are somewhat nervous when confronted by a police officer."[59]  We then held that because the police officer's testimony established that Lassaint was both nervous *and* cooperative, his conduct did not indicate "a consciousness of guilt."[60]  As in *Lassaint*, the evidence in this case established that though Lopez was nervous, he was also cooperative:  he did not attempt to flee, he responded to questions asked, and he provided oral and written consent to a search of the Lancer.  While knowledge of the cocaine's presence in the trunk may have given rise to Lopez's nervousness, it may have just as easily resulted from (1) Deputy Shaddox's presence by itself;[61] (2) his knowledge that neither he nor Ruiz were carrying either their licenses or

---

[57] *Lassaint*, 79 S.W.3d at 739.

[58] *Id.* at 743.

[59] *Id.* (citation omitted).

[60] *Id.*

[61] Deputy Shaddox acknowledged at trial that some individuals simply get nervous when stopped by peace officers.

proof of insurance; or (3) the fact that he was not from this country.[62]

### 4. Incriminating Statement

We also observe that one could draw more than one inference from Lopez's statement to Deputy Wyatt: "Who point the finger?" On cross-examination, Lopez's counsel vocalized at least one competing inference when he asked Deputy Wyatt if the statement could suggest an innocent person asking, "who set me up" or "who's telling you I did this?" Though Deputy Wyatt replied that an innocent person would not use the terms utilized by Lopez, but would simply say, "I didn't do anything," case law reveals that even a statement such as this is not immune from scrutiny.[63]

### 5. Logical Force of Factors Combined in Proving Knowledge

Though this Court can question and reveal weaknesses in every factor the State utilizes to link Lopez to the cocaine, we cannot simply assess the strength of the State's case by analyzing every factor in isolation;[64] rather, we must analyze the logical force of

---

[62] Some courts have even determined that a lack of nervousness may indicate guilt. *See, e.g., Rosales v. State*, 50 S.W.3d 650, 655-56 (Tex. App.–Waco 2001, pet. ref'd.) (stating that a "lack of surprise or concern during a temporary detention and investigation can suggest knowledge of the presence of contraband"). As observed by Justice Brian Quinn in *Valle v. State*:

> It is interesting how easily evidence of demeanor can be manipulated to mean just about anything. Some suggest that nervousness indicates guilt. Others find culpability in a suspect's calmness. Should he cooperate with law enforcement or consent to a search, then that simply means (as one officer has insinuated here) he is setting himself up to later feign surprise and innocence. But, if the suspect were to be uncooperative or refuse to permit a search, then he must be hiding something, some would say. Interesting, indeed.

223 S.W.3d 538, 543 n.3 (Tex. App.–Amarillo 2006, pet. dism'd).

[63] *See Valle*, 223 S.W.3d at 542-43 (discussing a police officer's testimony, in which the officer opined that the accused's cooperativeness during a traffic stop, and his reaction of disbelief upon the officer's discovery of contraband, "is often an attempt to mask guilt").

[64] *See Evans*, 202 S.W.3d at 164.

the factors combined in establishing the elements of the offense.[65] Upon assessing that logical force, we must then determine whether it generates more than a strong suspicion or mere probability of guilt.[66]

Based on a neutral view of the following facts, we find that the jury could have reasonably inferred that at least one individual—either Lopez or Ruiz—knowingly participated in a drug transaction with Cosio: (1) Lopez and Ruiz co-owned the Lancer; (2) both were present at the McDonald's and spoke with Cosio; (3) both were obviously aware that Cosio had driven away in their vehicle for some purpose; (4) it can be reasonably inferred, as explained above, that Cosio placed cocaine in the Lancer; and (5) it can be reasonably inferred that Cosio would not have placed cargo valued at $630,500 to $729,000 in the Lancer without informing at least one of its owners of all the details surrounding his responsibility and the importance of the cargo in his care.[67] We do not believe that this inference, by itself, permits a fact-finder to conclude beyond a reasonable doubt that Lopez knew the Lancer contained cocaine. This Court does believe, however, that a fact-finder can come to this conclusion when Lopez's statement to Deputy Wyatt is combined with the aforementioned facts.

It was the jury's responsibility to resolve conflicts in the evidence and to draw reasonable inferences from it. We presume that the jury chose to infer that Lopez's statement meant "who told on me or who knew I was dealing the drugs, taking the drugs

---

[65] *See Lassaint*, 79 S.W.3d at 741.

[66] *See Grant*, 989 S.W.2d at 433.

[67] "[W]e permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial." *Hooper*, 214 S.W.3d at 15.

23

somewhere and told you to stop me," as suggested by Deputy Wyatt, rather than the meaning proffered by Lopez's counsel.[68]  In so doing, the jury rejected Lopez's alternative hypothesis that he was an innocent observer of a drug transaction between Ruiz and Cosio.[69]  The jury may have found support for its interpretation from (1) the belief that the words comprising the statement better lent themselves to the chosen interpretation, and (2) the fact that, just a few minutes prior to making the statement, Lopez was observed engaging in suspicious activity that resembled drug trafficking behavior.  We thus afford due deference to the jury's findings and decline to reevaluate the weight the jury afforded Lopez's statement in arriving at its verdict.

Accordingly, we find that the evidence generates more than a strong suspicion or mere probability that Lopez knew of the cocaine.  Moreover, because the evidence encompasses the fact that Lopez was an owner and occupant of the Lancer at the time the cocaine was discovered, we find that the jury could conclude beyond a reasonable doubt that Lopez knowingly possessed the cocaine.[70]  Though this case presents a close call, we simply cannot say that—from the totality of the evidence when considered in a neutral light—the evidence supporting conviction is so weak that the verdict seems clearly wrong and manifestly unjust.

## VI. CONCLUSION

---

[68] The jury's freedom to select among competing interpretations has its limitations.  *See Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.").

[69] Though Lopez did not present evidence at trial, he raised the alternative hypothesis through cross-examination of the State's witnesses.

[70] *See Williams-Hendricks*, 805 F.2d 496 at 501; *Sendejo*, 841 S.W.2d at 860.

24

The judgment of the trial court is affirmed.

_____
LINDA REYNA YAÑEZ,
Justice

Publish. TEX. R. APP. P. 47.2(b).

Opinion delivered and filed this
the 29th day of May, 2008.