

**NUMBER 13-07-00722-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**PAUL DE LA CRUZ,**                                       **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                    **Appellee.**

---

**On appeal from the 117th District Court
of Nueces County, Texas.**

---

**MEMORANDUM OPINION**

**Before Justices Yañez, Rodriguez, and Garza
Memorandum Opinion by Justice Yañez**

A jury convicted appellant, Paul De la Cruz, of possession of more than four grams

but less than 400 grams of cocaine with intent to deliver, a first degree felony.[1]  Appellant

---

[1] *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a), (d) (Vernon Supp. 2009).

was sentenced to twenty years' confinement. By five issues, appellant contends: (1) the evidence is legally insufficient to establish an affirmative link to the cocaine; (2-4) the trial court erred by admitting evidence of extraneous acts; and (5) the trial court erred in denying appellant's motion to suppress.[2] We affirm as modified.

## I. BACKGROUND

On October 29, 2006, police dispatch received a 911 call from an unknown person stating that there was a fight at "1707 Peabody Street," in Corpus Christi, Texas, and that someone was injured. Officer Ross Murray arrived at the residence, identified himself, and knocked on the door. When no one responded, Officer Murray entered the residence through an unlocked door leading into a bedroom. Officer Murray observed in plain view, a tray containing crack cocaine on top of a stereo, an identification card belonging to appellant on top of a speaker, and a scale on a desk next to the stereo in the bedroom.[3] In an open drawer, Officer Murray saw a handgun along with another identification card belonging to appellant. Officer Murray also discovered marihuana "blunts" on the windowsill next to a bed.[4] In the kitchen of the residence, Officer Murray found appellant's brother, Jesse De la Cruz, with an injured ankle. In "one of the main living rooms," Officer Murray found a scale in plain view.[5] Officer Murray also saw pictures of appellant and Jesse, which appeared to have been taken at the Peabody residence. Appellant was not

---

[2] We have regrouped and renumbered appellant's five issues.

[3] Officer Joseph Christian testified that after testing the substance found on the tray, "[i]t came up as cocaine base, also known as crack cocaine." According to Officer Christian, the cocaine weighed 34 grams.

[4] Officer Jerry Neal explained that a "blunt" "refers to a marijuana cigarette, cigar rolled up."

[5] Pictures of the scale were admitted through Officer Murray's testimony.

2

present at the residence when Officer Murray discovered the drugs.

Appellant was indicted jointly with his brother, Jesse, for possession of cocaine with the intent to deliver. The indictment further alleged that appellant used or exhibited a firearm during the commission of the offense. Pursuant to a plea agreement with the State, Jesse pleaded guilty to possession of four grams or more but less than 200 grams of cocaine.[6]

The jury found appellant guilty of possession of cocaine with intent to deliver, but acquitted appellant of using or exhibiting a deadly weapon during the commission of a crime. The jury assessed punishment at twenty years' confinement. This appeal ensued.

## II. THE EVIDENCE

At trial, the State offered the testimony of Officer Murray, Officer William Livingston, Officer Jerry Neal, Officer Joseph Christian, Lydia De la Cruz (appellant's sister), Investigator Jay Worthington, and Officer Jeff Mills, among others. The trial court admitted into evidence taped conversations at the Nueces County Jail between appellant and his mother and between Lydia and Jesse. The State alleged that these conversations provided evidence of appellant's intent to deliver cocaine.

Officer Neal, of the Corpus Christi Police Department, testified that although he "happened to show up" at the Peabody residence on October 29, 2006, it was not his case and he did not provide any assistance to the other officers on that case. However, according to Officer Neal, in August 2003, he had a previous encounter with appellant at

---

[6] Although appellant alleges in his brief that Jesse agreed to testify against appellant pursuant to the plea agreement, there is nothing in the record showing this. Furthermore, Jesse did not testify at appellant's trial.

the Peabody residence. Officer Neal stated that he was dispatched to the Peabody residence because someone reported that shots had been fired and that when he arrived, he saw a "subject run from the driveway into the side door of the residence." Officer Neal testified that he "gave chase, fresh pursuit, kicked the door open and [appellant] was there in that room" standing next to the door. Officer Neal saw a "sawed-off" shotgun and a pistol on the bed and a tray with "some crack cocaine on it."[7] Officer Neal stated that appellant's sister, who was pregnant at the time, came into the room and began crying.[8] According to Officer Neal, appellant then told him, "That it was his room, his stuff." Officer Neal arrested appellant and collected the evidence.[9]

Through Officer Neal's testimony, the trial court admitted State's exhibits 17, 9, 853, 852, 851, 850, 855, 14, 12, 860, 11, 15, and 8, which were pictures taken of appellant's bedroom in August of 2003. Officer Neal stated that the pictures showed: (1) a VCR that was attached to a camera outside of the residence and some shotgun shells next to the VCR (exhibit 851); (2) a camera outside the residence pointed toward the home (exhibit 852); (3) a camera inside the bedroom pointed toward the driveway (exhibit 8); (4) a wide shot of the residence showing where the camera was pointed (exhibit 14); (5) "[a] stereo with a speaker on the side and a small amount of crack cocaine in between" (exhibit 17); and (6) a shotgun and pistol in Officer Neal's trunk that he had recovered from appellant's

---

[7] Officer Jeff Mills testified that the cocaine found at that time by Officer Neal weighed .88 grams.

[8] Lydia, appellant's only sister, testified that she has only one child who was born in 2000 and that she was not pregnant in 2003.

[9] On cross-examination, Officer Neal stated that the charges against appellant stemming from the August 2003 incident were dropped by the district attorney's office.

room (exhibit 12).[10]   Officer Neal stated that he knew from personal experience that "[appellant] lives in that particular room that [he] was showing, or that's on the photographs."

Officer Livingston, also of the Corpus Christi Police Department, testified that he has worked on over one hundred cases involving "drug houses."  According to Officer Livingston, some of the things that are indicative of a "drug house" include:  (1) "stop and go traffic," i.e., when several cars arrive at the residence in a short period of time, and the occupants of the cars enter the residence for a few minutes and then leave; (2) surveillance cameras; (3) "word on the street" that the residence is a "drug house"; (4) calls or complaints from neighbors that there is a lot of traffic at the residence; (5) weapons in the residence; (6) "the packaging and assorted materials used to . . . prepare [the] narcotics," such as "miniature Ziplock" bags; (7) "paraphernalia" or items "associated with the preparation of drugs or in drug trafficking"; (8) in cases of crack cocaine, items such as baking soda, vinegar, or glass vessels used to prepare the "crack"; and (9) a large amount of narcotics, "[u]sually anything over a gram."

Officer Livingston testified that the amount of crack cocaine considered for personal use is "called a rock," which usually weighs about .08 grams.  Officer Livingston stated that when the police discover "anything" over one or two rocks, the police begin investigating whether the person in possession is selling the narcotics.  According to Officer Livingston, there are two types of sellers of narcotics, a street-level dealer who sells the drugs "on the

---

[10] Officer Neal did not describe the other exhibits admitted.  The other pictures showed: (1) a close-up picture of a VCR, small TV, and speakers (exhibit 9); (2) a close-up of a pistol (exhibit 853); (3) VCR "hook-up" to the outside camera (Exhibit 851); (4) a camera pointed outside (exhibit 855); (5) a picture of a residence (exhibit 860); and (6) a lighter and an unknown object on a windowsill (exhibit 11).

5

street" and would probably have "five, ten rocks on him" and the person supplying the street seller, who would have either multiple grams or larger amounts over an ounce.[11] Officer Livingston testified that a "rock" is .08 grams, and that a gram of crack cocaine can be divided into seven doses or units. To determine how many doses can be created from an ounce of crack cocaine, one would multiply seven (doses per gram) by twenty-eight, which is the amount of grams in one ounce.[12] According to Officer Livingston, the usual unit of a rock of cocaine sells for twenty dollars, but that there is also a smaller quantity referred to as "dime-size rocks" and larger amounts that are sold for fifty dollars.

The State then asked Officer Livingston to review State's exhibits 203 and 9, pictures taken at the Peabody residence on October 29, 2006.[13] Officer Livingston testified that exhibit 203 showed a tray containing a large "chunk" of crack cocaine that is part of a "cookie," smaller pieces referred to as "dimes" and "twenties," and larger pieces called "fifties." Officer Livingston stated that large amounts of narcotics indicate that someone was probably selling the drugs. Officer Livingston described the item in State's exhibit 9 as a "Tec 9 pistol," which is, according to Officer Livingston, "used—it's liked by people who are in the drug business, because of the way it looks." Officer Livingston then reviewed several pictures taken when the August 2003 incident occurred, including State's

---

[11] Officer Livingston stated, "Depending on the . . . the amount that [the person has], then . . . we're gonna consider them a higher level—level dealer. When you start getting over the ounces, then that's—especially when it comes to crack cocaine, that's to me an indication of a pretty sizable dealer."

[12] Officer Livingston did not state the total amount of doses in one ounce; however, based on our calculation, the number of doses using his formula is 196.

[13] State's exhibit 203 was admitted through Officer Murray's testimony along with State's exhibit 18, a picture of what appears to be a dining room, and State's exhibits 19, 20, and 21, pictures of an open drawer with a weapon and one of appellant's identification cards.

6

exhibits 855 and 15. Officer Livingston stated that he believed State's exhibit 855 showed a surveillance camera, which "tells [him] that—that that's probably a place being used to traffic narcotics, because surveillance cameras are commonly used by narcotics traffickers to protect their investment, their drugs, their money." Officer Livingston explained that State's exhibit 15 showed a scale, which is "used to weigh out the narcotics."

On cross-examination, Officer Livingston admitted that he did not know who lived at the Peabody residence. Furthermore, he did not know that Jesse had presumably "claimed ownership" of the drugs found at the Peabody residence, by stating "They [the drugs] were mine." On redirect examination by the State, Officer Livingston identified State's exhibit 601 as a picture of a Texas State Department of Public Safety identification card issued to appellant showing his address as 1707 Peabody.[14]

Lydia, appellant's sister, testified that she previously lived at the Peabody residence with appellant, her mother, and Jesse. During direct examination,[15] when asked by the State if she remembered that after Jesse showed her some pictures, she told appellant "that they had a picture of his I-Tec gun there; also that they had a picture of a plate with a big cookie, with several dimes and twenties?," Lydia responded that she remembered that conversation. Then the following colloquy occurred:

> [The State]: And you told [appellant] that there was a picture of his I-Tec gun, also, a picture of his stereo, also a picture of some blunts on his window sill, and also about that plate that had a picture of a cookie, dimes and twenties.

---

[14] The identification card was found by Officer Murray in October 2006.

[15] The trial court allowed the State to treat Lydia as a hostile witness by asking leading questions.

7

[Lydia]: I did say that, but I didn't really mean—

[The State]: Did you say that, ma'am?

[Lydia]: —it was his. It was just the way—

[The State]: Ma'am, answer—

[Lydia]: it came out.

[The State]: —my question.

. . . .

[The State]: Did you?

[Lydia]: Yes, I did—

[The State]: —say that?

[Lydia]: —say that.

On cross-examination, Lydia testified that Jesse showed her some pictures of drugs that Jesse claimed belonged to appellant.

The trial court admitted State's exhibits 1200 and 1201, transcripts of several conversations between appellant and his mother, Linda, recorded while he was an inmate at the Nueces County Jail awaiting trial. Javier Carrizales, the "Official Court Interpreter for Nueces County," translated the conversations from Spanish to English, and the prosecutor read excerpts from the transcripts into the record.[16] In the first conversation, appellant spoke to Linda about his bond and then asked, "[H]as Lu made any money, my money?" Linda replied, "Uh, just 50." Appellant told Linda that "[t]here's supposed to

---

[16] The trial court admitted the actual recordings, marked State's exhibits 201 and 202, through the testimony of Jay Worthington, an internal affairs investigator with the Nueces County Sheriff's Department and custodian of recorded phone calls. Although these tapes were played for the jury, the tapes were not transcribed by the court reporter and are not included in the record.

be . . . 200," and that Linda should tell "Luis" not to "mess with the other one."  Linda

informed appellant that she did not know whether Luis "[was] selling."  The State then read

excerpts from the transcripts to the jury, including the following:

[Appellant]:  There's supposed to be like, um the one I already had already there, it should be like 200. . . .  So make sure it is 200 and the other one, that's the one that he hasn't messed, tell him don't mess with that one.

    . . . .

[Linda]:  Okay.  That way, so I can tell Luis that I need to give him more money.  I don't know how much Luis has or if he is selling, or if he is not, or he is just spending it.

[Appellant]:  You better not—like I told you, I got like 200 and the other one, that the other one is like 300.  The one I haven't messed with.

    . . . .

[Linda]:  Okay. Because I took some money from Luis.  I took some money because he said it wasn't 200, it was less.  And he took, like, 15 for himself to eat, since he was helping you sell it.

    . . . .

[Appellant]:  He hasn't messed with the other one?

[Linda]:  No.  I took it away from him.

[Appellant]:  It is still the big piece?

[Linda]:  The big one.

    . . . .

[Appellant]:  Did we sell anything else?

[Linda]:  I can't hear you, [appellant].

[Appellant]:  I said did Luis get rid of anything else?

[Linda]: Oh, I think he just needed a small one, like a 50 one, right?

. . . .

[Appellant]: How much money did y'all get? I should have like 200, at least, 180 something.

. . . .

[Linda]: I don't know how much Luis has on him.

[Appellant]: Uh-huh.

[Linda]: Yes. Because he is just fine there with the white girl. She wants 50. No. [Appellant] said that I can't touch that filth.

[Appellant]: I don't know what is in there. I don't want to cut it and then they leave me out of it.

[Linda]: Since Luis saw it, he said it was like $400.

. . . .

[Appellant]: Yeah, but I don't want to do nothing, because I don't want to mess it up.

[Linda]: That is why I told him that you don't want anything. I told him, "I think he just has a dime left."

. . . .

[Linda]: Yeah. [Luis] said I will sell it all. . . . He said it was 170 and he just took pen to ink. That is what he did. And 60, 70, 150 for you.

. . . .

[Linda]: You wanted 350 for everything.

[Appellant]: Yeah.

. . . .

[Linda]: Do you want to sell it? I said, "[Appellant] doesn't want anyone

10

to sell it.  He just wants 350 for it.  That is all."  I was going to ask Pete.

. . . .

[Appellant]: 300 at least.

. . . .

[Linda]: Oh, at least 300?  Okay.  That is fine.  Anyways, Lydia is going to see who wants some.  Like you said, you need someone who knows how to cut it, right?

[Appellant]: Yeah.

[Linda]: They're going to cut it like that, and then it's not going to come out.

. . . .

[Linda]: He gave Nieto a dime to go get some filth, and Nieto never came back. . . .

. . . .

[Linda]: What can I tell you?  I was going to tell you something.  Oh, like, Chrissy told me that they didn't have any evidence on anybody with that filth.  They didn't catch anyone with it, right?

[Appellant]: Uh-huh.

[Linda]: And you-all can fight, saying that there was nobody, and that the filth—somebody put it there.  That's all.  It is one.  Not Jesse.  He's going back, anyways for parole and all of that.

. . . .

[Linda]: I will have your money, the 150 by tonight.

[Appellant]: Yeah, because I want you to send it today, like take it to the mail today, so it could be here by tomorrow.

. . . .

[Appellant]: If not, just tell Lu to get rid of the other stuff I got.

. . . .

[Linda]: Luis already gave me all of the money.

[Appellant]: No, mom. The other stuff I had.

[Linda]: I have it stored.

[Appellant]: Well, give it to somebody, so they can sell it for me.

. . . .

[Linda]: Okay. Anyways, I will tell (undecipherable) to sell it for more.

[Appellant]: Tell Lu I at least want 300 out of it.

. . . .

[Appellant]: Did she get me the other stuff or what?

[Linda]: Nah. It is right, they have to weigh it to see how much it is?

[Appellant]: Uh-huh.

[Linda]: At night, I'll give it to him, because I don't think he knows where it is at.

[Appellant]: Uh-huh.

[Linda]: And no one is going to buy it like that. You need to weigh it to see how much it is.

. . . .

[Linda]: I had 30 left, and no one wants it the way you want to do it.

[Appellant]: What?

[Linda]: Buy the 300 just like that.

[Appellant]: I said tell Lu to cut it, I said.

[Linda]: Oh, Luis knows how?

[Appellant]: Yeah, I'm pretty sure he does. But tell him to at least cut 300 out of it. Tell him I at least want 300 out of it.

. . . .

[Linda]: Both of y'all are going to go to court, right?

[Appellant]: Yeah.

[Linda]: Well, you need to tell them that it wasn't a lot of filth, that the door was open and they left it all there.

[Appellant]: I know.

[Linda]: That's all that can be done. I don't know. Anyways, I need to know how much filth it is?

[Appellant]: What, mom?

[Linda]: I need to know, so I can know how much of all of that is going to be.

. . . .

[Appellant]: Where is everybody at? Did you ever move the other stuff?

[Linda]: No. No one knows how to cut it.

[Appellant]: Okay.

. . . .

[Linda]: Lydia went to see Jesse.

[Appellant]: Uh-huh.

[Linda]: And Pete, right? They said they had pictures of you-all when they took the filth out of the house.

[Appellant]: Uh-huh.

[Linda]: They can't give the pictures they have to Junior.

13

[Appellant]:   The what, Mom?

[Linda]:   They can't give him the pictures that they took of the house. They can't give them to Junior.

[Appellant]:   I don't know.

[Linda]:   He just said they have photos from your drawer, right?

[Appellant]:   Uh-huh.

[Linda]:   There's a lot of . . . knives, rocks, and I don't know how much rock you had, and a pistol, and they all have the—that in photos.

[Appellant]:   Uh-huh.

[Linda]:   And all of that Junior has.

        . . . .

[Linda]:   And Lydia, Jesse showed Lydia all of that.

[Appellant]:   Oh?

        . . . .

[Linda]:   Marijuana, also.  You did marijuana, too?

[Appellant]:   No.

[Linda]:   Right.  You don't have a lot of filth.

[Appellant]:   No.

[Linda]:   She said there was some [filth] on top of the TV and another one on the window, and you had it everywhere.

[Appellant]:   Oh, no mom.

[Linda]:   They have all the photographs and Junior showed it to Lydia. I know they can give it to anybody, just to them.

14

[Appellant]:    No.

### III. AFFIRMATIVE LINKS

By his first issue, appellant contends that the evidence is legally insufficient to establish an affirmative link between him and the cocaine found in the bedroom of the Peabody residence.[17]  The State counters that the evidence showed that the drugs were discovered in appellant's bedroom, there were two official identification cards belonging to appellant found in close proximity to the drugs, and "both [appellant] and other members of his family made damaging admissions and hearsay statements, admitted without objection, linking him to the cocaine in question."

## A.  Standard of Review and Applicable Law

In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[18]  We must consider all of the evidence that the trier of fact considered even if that evidence was wrongly admitted.[19]  "It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances."[20]

---

[17] Appellant does not challenge any other elements of possession of cocaine with intent to deliver. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a), (d).

[18] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005).

[19] *Lopez v. State*, 267 S.W.3d 85, 95 (Tex. App.–Corpus Christi 2008, no pet.).

[20] *Id.* (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

15

A person commits an offense if the person knowingly or intentionally possesses a controlled substance in Penalty Group 1 with intent to deliver.[21] To prove possession of a controlled substance, the State must show that the accused: (1) intentionally or knowingly exercised control, management, or care over the substance; and (2) knew that the substance was contraband.[22] However, "[w]hen an accused is not in exclusive possession and control of the place where contraband is found, it cannot be concluded he had knowledge or control over the contraband unless there are additional independent facts and circumstances that affirmatively link him to the contraband."[23] A link between the accused and the contraband may be established by the following nonexclusive list of factors: (1) the contraband was in plain view; (2) the accused owned the premises or had the right to possess the place where the contraband was found; (3) the accused had a large amount of cash when found; (4) the accused's access to the contraband; (5) the accused's close proximity to the contraband; (6) there was a strong residual odor of the contraband; (7) the accused possessed other contraband when arrested; (8) paraphernalia to use the contraband was present on the accused or in plain view; (9) the accused was under the influence of narcotics when arrested; (10) the accused's conduct indicated a consciousness of guilt; (11) the accused attempted to escape or flee; (12) the accused made furtive gestures; (13) the accused had a special connection to the contraband; (14) conflicting statements about relevant matters were made by the occupants of the place

---

[21] *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) (Vernon Supp. 2009).

[22] *Lopez*, 267 S.W.3d at 91.

[23] *Lassaint v. State*, 79 S.W.3d 736, 740 (Tex. App.–Corpus Christi 2002, no pet.).

16

where the contraband was found; (15) the accused made incriminating statements connecting himself to the contraband; (16) the quantity of the contraband; and (17) the accused was observed in a suspicious area under suspicious circumstances.[24] The sufficiency of links is not based on the number of factors established, but on the logical force of all the circumstantial and direct evidence.[25]

## B. Analysis

In this case, it is undisputed that appellant was not present at the Peabody residence when Officer Murray found the drugs on October 29, 2006, and we acknowledge that many of the factors usually linking a defendant to the contraband are not present in this case. However, the list is nonexclusive, and the jury heard evidence of additional independent facts and circumstances that link appellant to the contraband in this case.[26]

First, Officer Neal testified that in a previous encounter, he entered the Peabody residence through a "side door" that led to a bedroom appellant claimed was his room. Officer Murray testified that he entered the Peabody residence through a door leading to a bedroom where he discovered the drugs with a Texas driver's license belonging to appellant.[27] The driver's license listed the Peabody residence as appellant's address.

Next, Lydia admitted that she told appellant that Jesse showed her pictures of

[24] *Lopez*, 267 S.W.3d at 92.

[25] *Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006); *Lopez*, 267 S.W.3d at 92; *Lassaint*, 79 S.W.3d at 741.

[26] *See Lassaint*, 79 S.W.3d at 740; *see also Lopez*, 267 S.W.3d at 92 ("There is no established or set formula of factors that would dictate a finding of a link to support a reasonable inference of knowing possession of contraband.").

[27] Officer Murray testified that the Peabody residence only had two bedrooms.

17

appellant's gun, stereo, and "blunts" on his windowsill. Lydia stated she told appellant that there was a picture of a plate of drugs and that Jesse told her the drugs belonged to appellant.[28]

Finally, appellant's mom, Linda, told appellant that "they" had pictures of "some [filth] on top of the TV and another one on the window." Officer Murray testified that he found marihuana on top of a television set and marihuana "blunts" on the windowsill next to a bed. Linda also stated that the pictures were of appellant's drawer, pistol, and knife. State's exhibits 19, 20, and 21 show an open drawer with a gun found next to appellant's identification card. Linda also informed appellant that there was a picture of his "rocks." Officer Livingston described crack cocaine as "rocks," and Officer Mills stated, "'Rock' is a—the street term for cocaine base or crack cocaine." In addition, during his conversations with his mother, appellant discussed cutting and then selling an unspecified item. Officer Murray testified that "cutting it up" refers to "using a razor blade to cut a smaller piece of crack cocaine from a larger piece."

Construing the above evidence in the light most favorable to the verdict,[29] we conclude that based on the logical force of all the evidence, the jury could have found an affirmative link between the cocaine and appellant beyond a reasonable doubt and that appellant intentionally or knowingly exercised control, management, or care over the cocaine and knew that the substance was contraband.[30] Therefore, the evidence was

---

[28] This testimony was admitted without objection.

[29] See Jackson, 443 U.S. at 319; Poindexter, 153 S.W.3d at 405.

[30] See Lopez, 267 S.W.3d at 91.

18

legally sufficient to support appellant's conviction.  We overrule appellant's first issue.

## IV.  EXTRANEOUS OFFENSE EVIDENCE

By his second issue, appellant challenges the trial court's admission of extraneous offense evidence.  Specifically, appellant contends that pursuant to Texas Rules of Evidence 404(b) and 403, the trial court erred in admitting evidence that appellant "possibly possessed cocaine in August 2003."  The State maintains that the evidence was admissible to prove appellant's intent to deliver.[31]  By his third and fourth issues, appellant contends that evidence that Officer Murray found a handgun and marihuana at the Peabody residence was inadmissible.

### A.  Standard of Review and Applicable Law

We review a trial court's admission of extraneous offense evidence under an abuse of discretion standard.[32]  We must uphold the trial court's decision to admit the extraneous evidence if it is within the zone of reasonable disagreement.[33]  "An appellate court would misapply the appellate abuse of discretion standard of review by reversing a trial court's admissibility decision solely because the appellate court disagreed with it."[34]

Pursuant to rule 404(b), evidence of other crimes, wrongs, or acts is inadmissible "to prove the character of a person in order to show action in conformity therewith."[35]

---

[31] The trial court admitted the extraneous offense evidence for this purpose.

[32] *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001).

[33] *Id.*

[34] *Id.*

[35] *Berry v. State*, 233 S.W.3d 847, 858 (Tex. Crim. App. 2007) (quoting TEX. R. EVID. 404(b)).

19

However, such evidence is admissible if offered for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[36] To be admissible under rule 404(b), evidence of appellant's alleged possession of .88 grams of cocaine in 2003 would have to be relevant apart from showing character.[37] The evidence is relevant if it

> tends to establish some elemental fact, such as identity or intent; that it tends to establish some evidentiary fact, such as motive, opportunity or preparation, leading inferentially to an elemental fact; or that it rebuts a defensive theory by showing, e.g. absence of mistake or accident . . . [or] that it is relevant upon a logical inference not anticipated by the rulemakers.[38]

"Where the state's direct evidence, however, clearly shows the intent element of the crime and that evidence is uncontradicted by the defendant or not undermined by cross-examination of the state's witnesses, the offer of other crimes is unjustified [to prove intent] due to the lack of relevancy."[39]

## B. Analysis

### 1. Evidence of the 2003 Incident at the Peabody Residence

Evidence of the 2003 incident was not admissible under rule 404(b) because it did not tend to make appellant's intent to deliver the crack cocaine in 2006 more or less

---

[36] T EX. R. EVID. 404(b); *De La Paz v. State*, 279 S.W.3d 336, 342-43 (Tex. Crim. App. 2009).

[37] *Rankin v. State*, 974 S.W.2d 707, 718 (Tex. Crim. App. 1998) (op. on reh'g) ("If the trial court determines the evidence has no relevance apart from character conformity, it is inadmissible.").

[38] *Id.*

[39] *Id.* at 719.

likely.[40] The State presented evidence that during the 2003 incident, appellant admitted to possession of cocaine, and a surveillance camera was found in his bedroom. Officer Livingston then testified that "surveillance cameras are commonly used by narcotics traffickers to protect their investment, their drugs, their money." However, no evidence was presented that the surveillance camera found in appellant's bedroom in 2003 was used to protect appellant's "investment, drugs, or money." Furthermore, no evidence was presented that in 2003, appellant possessed the cocaine with the intent to deliver and appellant was not charged with an offense for that incident. In fact, Officer Mills stated that the amount of cocaine found in 2003, .88 grams, would be typical for personal use; and Officer Livingston testified that, in his experience as a narcotics investigator, he considered less than one gram of cocaine to be an amount for personal use.

The fact that appellant allegedly possessed a small amount of crack cocaine, the amount an individual would possess for personal use, in 2003 was not probative as to appellant's intent to possess the larger amount of crack cocaine on the date of the charged offense. Therefore, the extraneous offense evidence did not tend to make it more or less likely that appellant possessed the large amount of crack cocaine in 2006 with the intent to deliver.

The State alleges that appellant "opened the door" to the extraneous offense evidence because he claimed in his opening statement that the drugs were not his and

---

[40] *See id.* at 718 (providing that "if a defendant objects on the grounds that the evidence is not relevant, violates Rule 404(b), or constitutes an extraneous offense, the proponent must show that the evidence has relevance apart from showing character") (citing *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990) (en banc) (op. on reh'g)).

21

belonged to Jesse.[41]  Here, we find that appellant did not go "beyond simply pleading not guilty" during his opening statement by asserting that the cocaine did not belong to him; therefore, he did not open the door to admission of the extraneous offense evidence.[42]

Moreover, appellant's intent to deliver may have been inferred from the quantity of drugs possessed by appellant[43] and from the other evidence presented by the State.  The State presented evidence that the amount of crack cocaine found was thirty-four grams. The State presented Officer Livingston's testimony that large amounts of narcotics indicate that someone was probably selling the drugs.[44]  Officer Livingston testified that State's exhibit 203, a picture of items found by Officer Murray at the Peabody residence in 2006, showed "a large chunk" or "cookie" of crack cocaine, and several smaller pieces of crack cocaine called "dimes," "twenties," and "fifties."  Officer Livingston also stated that a "Tec 9 pistol"—the type of weapon found with the drugs at the Peabody residence in 2006—is "liked" by people who deal drugs.  Officer Christian testified that thirty-four grams is considered too much for mere "personal use."  Furthermore, appellant asked Linda to sell

---

[41] *See Robbins v. State*, 88 S.W.3d 256, 261 (Tex. Crim. App. 2002) (concluding that the extraneous evidence of appellant's relationship with the victim was relevant because appellant "went beyond simply pleading not guilty through vigorous cross-examination of the prosecution witnesses suggesting that the victim's death was caused by some means other than an intentional act by appellant," and concluding that it was "at least debatable whether this is sufficient to put appellant's intent at issue").

[42] *See id.* ("[I]n Texas a simple plea of not guilty usually does not make issues such as intent a relevant issue of consequence for purposes of determining the admissibility of relationship evidence under Rule 404(b)."); *Garcia v. State*, 201 S.W.3d 695, 704 (Tex. Crim. App. 2006) (stating that in *Robbins*, "we pointed out that a simple plea of not guilty does not put intent at issue in each case").

[43] *Parker v. State*, 192 S.W.3d 801, 805 (Tex. App.–Houston [1st Dist.] 2006, pet. ref'd).

[44] *Hankton v. State*, 23 S.W.3d 540, 546 (Tex. App.–Houston [1st Dist.] 2000, pet. ref'd) (explaining that "possession of large quantities of cocaine, corroborated by expert testimony, is sufficient to prove intent to deliver").

an undisclosed item and to find someone to "cut" it up, which Officer Murray described as "using a razor blade to cut a smaller piece of crack cocaine from a larger piece." From this evidence, the jury was free to infer that appellant and Linda were arranging the sale of crack cocaine while he was in jail. Therefore, we conclude that admission of the 2003 incident was unjustified due to the lack of relevancy.[45] Because the 2003 incident was not relevant to a fact of consequence aside from its tendency to show action in conformity with character,[46] we conclude that the trial court abused its discretion by admitting it.[47]

However, our analysis does not end here. Because we have found error in the admission of the extraneous evidence, we must conduct a harm analysis.[48] In our analysis, we disregard nonconstitutional error that does not affect the substantial rights of the defendant.[49] "A substantial right is violated when the error had a substantial and injurious effect or influence in determining the jury's verdict."[50]

Here, the jury properly heard evidence that appellant, while in jail, directed Linda and others to continue selling crack cocaine. The jury also heard Lydia's testimony that the drugs found at the Peabody residence belonged to appellant and Linda's testimony that pictures of appellant's "rocks" existed. That appellant may, in a collateral case, have

---

[45] *Rankin*, 974 S.W.2d at 719.

[46] *See id.* at 718.

[47] *See Powell*, 63 S.W.3d at 438.

[48] *See* TEX. R. APP. P. 44.2; *Reyes v. State*, 69 S.W.3d 725, 742 (Tex. App.–Corpus Christi 2002, pet. ref'd) (providing that the erroneous admission of extraneous evidence is subject to a harm analysis).

[49] TEX. R. APP. P. 44.2(b).

[50] *Reyes*, 69 S.W.3d at 742.

23

possessed .88 grams of crack cocaine three years earlier seems almost insignificant in comparison with his conduct in the primary offense. Therefore, after reviewing the record, we conclude that the error did not have a substantial and injurious effect or influence in determining the jury's verdict."[51] Accordingly, appellant's second issue is overruled.

*2. Evidence of the Gun and Marihuana*

Appellant argues that the gun found at the Peabody residence in 2006 "is not relevant to the charges." However, as the State correctly asserts, the indictment alleged that appellant "during the commission of the offense, used and exhibited a deadly weapon, to-wit: a firearm." Therefore, evidence that the gun was found with the drugs was relevant to the charged offense and was not inadmissible pursuant to rule 404(b).[52] We overrule appellant's third issue regarding the admission of the gun.

Appellant also maintains that the trial court should have excluded evidence of the marihuana pursuant to rule 403, arguing that evidence of the marihuana was not relevant, "impressed the jury in some irrational way," and "the State had no need for presenting [evidence of the marihuana] to prove any fact of consequence." The State counters that evidence of the marihuana was relevant to prove that the cocaine was linked to appellant.[53]

At trial, before Officer Murray testified, appellant objected to any testimony that

---

[51] *See Reyes*, 69 S.W.3d at 742.

[52] *See Coleman v. State*, 145 S.W.3d 649, 654-55 (Tex. Crim. App. 2004) (providing that even if the defendant is not present when a gun is found in close proximity to drugs, there is sufficient evidence to show that the weapon was used to protect or facilitate possession of the drugs, and thus to support a finding that the defendant used the deadly weapon during the commission of a crime).

[53] *See Brown v. State*, 911 S.W.2d 744, 748 (Tex. Crim. App. 1995) ("Indeed, we have even recently held that evidence of extraneous transactions may be admitted in drug possession cases whenever they tend "to prove the requisite affirmative link to the contraband.") (citing *Saenz v. State*, 843 S.W.2d 24, 27 (Tex. Crim. App. 1992)).

marihuana was found at the scene because appellant had not been charged with that offense and it was an extraneous offense. The trial court overruled appellant's objections and admitted evidence of the marihuana on the basis that it was "part of the whole scene." Appellant did not object to evidence of the marihuana on the basis that it was not relevant or that it was inadmissible pursuant to rule 403, as he now argues on appeal.

Officer Murray then testified, without objection, that when he entered the bedroom, he noticed "marijuana in plain view on top of a large television that was against the north wall." Later, when the State offered exhibits 49 and 50 into evidence, pictures of what Officer Murray identified as "[m]arijuana blunts [he] found in the room," appellant objected to those exhibits pursuant to rules 404(b) and 403. Although appellant objected to the exhibits depicting the marihuana found at the Peabody residence pursuant to rule 403, he did not object on that basis when Officer Murray previously testified that he found marihuana in plain view. Therefore, appellant did not preserve error.[54] We overrule appellant's third issue regarding admission of evidence that Officer Murray found marihuana at the Peabody residence.

## 3. Testimony of Narcotics Officer

By his fourth issue, appellant contends that the "trial court improperly admitted testimony from [a] specialized narcotics officer portraying appellant's house as a drug

---

[54] *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (en banc) (providing that overruling an objection to evidence will generally not result in reversal when evidence of the same fact was received, either before or after the complained-of ruling); *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991) (en banc) ("[I]t is well settled that an error in the admission of evidence is cured where the same evidence comes in elsewhere without objection; defense counsel must object every time allegedly inadmissible evidence is offered.").

house in general without notice to the defense" pursuant to rule 404(b).[55] Appellant argues that Officer Livingston's testimony that the Peabody residence was a "drug house" constituted extraneous offense evidence requiring notice.

Assuming that the State portrayed the Peabody residence as a "drug house," appellant has cited to no authority, and we find none, providing that a description of an inanimate object, such as a house, is treated as a crime, wrong, or act attributable to the defendant.[56] Therefore, we overrule appellant's fourth issue.

## V. MOTION TO SUPPRESS

By his fifth issue, appellant contends that the trial court should have granted his motion to suppress the evidence found at the Peabody residence. Appellant argues that the police officer's entry and search of the residence was illegal.

Appellant filed a motion to suppress requesting that the trial court suppress all evidence found as result of the allegedly illegal search. In his motion, appellant argued that there was no probable cause or permission to search the Peabody residence. At a pre-trial hearing, appellant told the trial court that it could hear the motion to suppress "along with the case" and make a ruling at the time. The trial court agreed to hear the motion at trial and make a ruling at that time. At the pre-trial hearing, the trial court did not hear any evidence on appellant's motion to suppress.

At trial, during direct examination by the State, Officer Murray testified, without

---

[55] *See* TEX. R. EVID. 404(b).

[56] *See Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003) ("An extraneous offense is any act of misconduct, whether resulting in prosecution or not, that is not shown in the charging papers. It is an offense that is extra, beyond, or foreign to the offense for which the party is on trial.") (internal quotations omitted).

26

objection, that he entered the Peabody residence through an unlocked door after being dispatched to the Peabody residence. Officer Murray stated that when he entered, he

> noticed in plain view, on the right side of me, which would be on the east side of the room, there was a desk with a stereo on it. On top of the stereo there's a tray with what I was able to identify as crack cocaine. Next to it was an ID. In addition, on that desk, there was a desk drawer that [was] open and in plain view, there was a handgun, as well as an ID next to the handgun. There was paraphernalia. I continued in through the room. I noticed there was marijuana in plain view on top of a large television that was against the north wall. . . .

The State later asked, "Officer, you testified that you saw a weapon there?" and Officer Murray responded, "Yes sir." Officer Murray then described the weapon as an "Intertech9mm" and described it as a "handgun that's designed to shoot 9mm rounds" with a "high-capacity magazine." According to Officer Murray, a "[h]igh-capacity magazine is one that's designed to hold a large number of rounds." Appellant did not object to this testimony.

The State then offered into evidence: (1) a picture of the dining room; (2) a picture that Officer Murray described as an open drawer with a gun inside[57]; (3) a close-up photo of the identification card belonging to appellant found in the drawer near the gun; (4) another picture of the open drawer with the gun and identification card inside; and (5) a picture of a tray with the crack cocaine. After appellant's trial counsel took Officer Murray on voir dire, he stated that he had no objection to admission of those exhibits.[58] The trial

---

[57] We note that there are two State's exhibits marked as 19 in the record. The other State's exhibit 19 appears to be a picture of the surveillance camera found in the Peabody residence in 2003.

[58] During the voir dire examination, Officer Murray stated that he did not take the photographs, that the photographs depicted the scene as he found it on that day, that the drawer was open when he arrived, and that he "froze the scene" before the crime scene investigators arrived.

27

court then admitted the pictures into evidence.

However, when the State offered into evidence the actual gun found at the Peabody residence, appellant objected "pursuant to the motion to suppress on file, that this was the result of an illegal search." The trial court asked the jury to leave the courtroom and asked Officer Murray several questions regarding his entry into the Peabody residence. Officer Murray told the trial court that after he knocked on the door and there was no response, he made entry to "determine if there was [sic] any injured parties or if there was a fight in progress." Officer Murray explained that he had been dispatched because there had been a 911 call indicating that someone had been in a fight and was injured at the Peabody residence. Appellant's counsel took Officer Murray on voir dire and Officer Murray stated that he did not know who made the 911 call because he had been dispatched. After hearing argument from the State and appellant, the trial court denied appellant's motion to suppress.

In *Flores v. State*, this Court concluded "that the rationale for permitting an accused to stand silent at trial following a pre-trial denial of a suppression motion does not apply when: (1) the trial court has not yet ruled on the motion; and (2) the State offers evidence the accused seeks to exclude."[59] Here, the trial court had not ruled on appellant's motion to suppress and instead, carried the motion over to trial. Therefore, the mere filing of his motion to suppress did not preserve error, and appellant was required to make a timely

---

[59] 129 S.W.3d 169, 173 (Tex. App.–Corpus Christi 2004, no pet.).

objection at trial to do so.[60]  Appellant did not object when the trial court admitted evidence that he sought to suppress, including Officer Murray's testimony that he found in plain view a tray with crack cocaine, a gun next to appellant's identification card, and marihuana.[61]  In fact, when the State offered pictures of the crack cocaine and the gun, appellant stated through his trial counsel that he did not object.  Although appellant later urged his motion to suppress outside the presence of the jury and objected to the admission of the evidence on the same grounds, we find that he failed to object at the earliest opportunity, and has therefore not preserved error.[62]  We overrule appellant's fifth issue.

## VI. MODIFICATION OF JUDGMENT

The Texas Rules of Appellate Procedure give this Court authority to modify judgments sua sponte to correct typographical errors and make the record speak the truth.[63]  The trial court's judgment indicates the statute for the offense of which appellant was convicted was Section 481.115 of the Texas Health and Safety Code, which is entitled "Possession of Substance in Penalty Group 1."[64]  Our review of the record shows that the

---

[60] *See Thomas v. State*, 884 S.W.2d 215, 216 (Tex. App.–El Paso 1994, pet. ref'd) (concluding that because appellant failed to obtain a hearing or ruling on his motion to suppress before trial, and agreed that the motion could be carried over to trial and raised by objection at the appropriate time, "the mere filing of the motion to suppress did not preserve error, and Appellant was required to make a timely objection at trial in order to do so").

[61] *See* TEX. R. APP. P. 33.1(a)(1)(A); *Flores*, 129 S.W.3d at 171; *Thomas*, 884 S.W.2d at 216 ("To be timely, an objection must be raised at the earliest opportunity or as soon as the ground of objection becomes apparent.").

[62] *See Thomas*, 884 S.W.2d at 216-17.

[63] TEX. R. APP. P. 43.2; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.–Texarkana 2009, no pet.); *Gray v. State*, 628 S.W.2d 228, 233 (Tex. App.–Corpus Christi 1982, pet. ref'd).

[64] *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115 (Vernon Supp. 2009).

correct statute for the offense is section 481.112(d) of the Texas Health and Safety Code.[65]

Therefore, we hereby modify the judgment to indicate that the statute under which appellant was convicted is section 481.112(d) of the Texas Health and Safety Code.

**VII. CONCLUSION**

We affirm the judgment as modified.

_____
LINDA R. YAÑEZ,
Justice

Do not publish.
*SEE* TEX. R. APP. P. 47.2(b).

Delivered and filed
the 1st day of April, 2010.

---

[65] *See id.* § 481.112(d).