


# NUMBER 13-23-00279-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**DOUGLAS SKAGGS,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

**On appeal from the 399th District Court of Bexar County, Texas.**

---

# MEMORANDUM OPINION

**Before Justices Longoria, Silva, and Peña**
**Memorandum Opinion by Justice Silva**

Appellant Douglas Skaggs appeals his conviction of murder, a first-degree felony, for which he received sixty years' confinement as punishment. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (c). By a single issue, Skaggs argues that the evidence is legally insufficient to support his conviction "because the State failed to prove beyond a reasonable doubt

that he did not act in self-defense." We affirm.

## I. Background[1]

Law enforcement was dispatched to a shooting at a hotel in San Antonio in the early morning hours on March 17, 2021. Upon arrival, emergency services identified a deceased male who was later identified as Jose "Tito" Elias Roman. Roman had been shot several times, including once in the face. A grand jury indicted Skaggs for murder. *See id.* § 19.02(b)(1), (2). The matter proceeded to a jury trial where approximately eighteen witnesses testified, including Skaggs, and ninety-five exhibits were admitted. To summarize, the following relevant evidence was adduced at trial.

### A. Rochelle Reddick

Rochelle Reddick testified that she and a friend, Michael Pizzini, were staying at the hotel the night of the shooting. Reddick was in the parking lot outside the hotel room when Roman showed up accompanied by a woman identified as "Hayley," later identified as Hayley Gibbens, asking permission to go into her room. Roman was a good friend of hers, so she gave Roman permission to go into her room, which he did.

Shortly thereafter, Reddick heard "six or seven" gunshots. Reddick denied hearing any discussion or argument coming from the room prior to the gunshots. Reddick returned to the room shortly after hearing the gunshots and discovered Pizzini on the phone with 9-1-1 and Roman laying on the floor with "blood everywhere." Reddick explained that she

[1] This case is before this Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* Tex. Gov't Code Ann. §§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). Because this is a transfer case, we apply the precedent of the San Antonio Court of Appeals to the extent it differs from our own. *See* Tex. R. App. P. 41.3.

ran out looking for Hayley but was unable to find her.

**B. Michael Pizzini**

Pizzini confirmed that he and Reddick were sharing a room on the night of the shooting. Pizzini explained that he was in the restroom when the shooting occurred and was unaware that Roman or anybody else was in his hotel room, believing only Reddick was. According to Pizzini, he heard the door to his hotel room open, followed by a "pop." Pizzini believed it was a firework being set off until he heard "probably five more" shots after that. Pizzini denied hearing any voices or arguing.

Pizzini did not see anybody else in the room besides Roman when he exited the restroom. Pizzini described the air in the hotel room as "[t]hick, the air was thick, smoky, almost like there was blood in the air." According to Pizzini, Roman "was face down holding his cell phone and a pack of cigarettes and a lighter." Pizzini later clarified that Roman's cell phone was in one hand while his cigarettes and lighter were in the other. Pizzini called emergency services, who directed him to perform CPR on Roman until help arrived. Pizzini confirmed that it was his voice in a 9-1-1 call recording that was admitted as an exhibit. Upon arriving on scene, law enforcement escorted Pizzini out of the room.

**C. Law Enforcement**

San Antonio Police Department (SAPD) Detective Raul Juarez testified that he was the lead detective in the case, and following a Crime Stopper's tip, he identified Skaggs and Hayley Gibbens as suspects. Detective Juarez estimated that Skaggs was in the hotel room with Roman for approximately forty-five seconds. However, Detective

Juarez could not be certain because the hotel surveillance cameras[2] were set to record after detecting motion, and Skaggs could not be seen actually entering the hotel room. Detective Juarez further testified that a male, later identified as Nicholas Darimont, was also seen on the hotel's surveillance cameras accompanying Skaggs. When law enforcement arrested Darimont, he was driving a vehicle that matched the description of the vehicle as seen in the surveillance footage from the shooting but had been spray painted to a different color. Detective Juarez testified he also obtained a search warrant for Roman's cell phone, which revealed text messages between he and Skaggs.

SAPD Detective Justin Knox testified that he and Detective Brian Stoole downloaded data from the cell phones recovered in this case, including from cell phones belonging to Roman, Skaggs, and Gibbens. Exhibits containing text messages from each cell phone were admitted into evidence. Among the messages downloaded were threatening messages purportedly sent from Skaggs to Roman in the days leading up to Roman's death, including: "You're going to need to look over the shoulder for the rest of your life, T. . . . I'm coming for you." The threats continued: "I will never stop coming for you"; "It will cost you your life"; "After your funeral I'm going to take your dog"; and "I have nothing better to do than hunt you." The messages that appeared as sent from Skaggs's cell phone appeared as received messages on Roman's cell phone and vice versa.

---

[2] SAPD Detective Kevin Schmactenberger testified that he pulled surveillance footage related to the shooting at Detective Juarez's direction. Detective Schmactenberger explained that he reviewed footage from the hotel and downloaded footage from nine different cameras to cover a thirty-minute window, which were admitted into evidence. However, only eight different camera angles appear in the exhibit that was admitted as evidence.

## D. Dr. Samantha Evans

Dr. Samantha Evans testified that she is a forensic pathologist in the Bexar County Medical Examiner's Office. Dr. Evans performed an autopsy on Roman—the report of which was admitted into evidence along with several photographs. Dr. Evans explained her findings to the jury, including summarizing and describing the wounds that Roman suffered. According to Dr. Evans, the gunshot to Roman's face included "evidence of intermediate range firing or powder stippling," suggesting the shooter was "within several feet" of Roman when the shot was fired. In total, Roman suffered nine gunshot wounds including to his face, torso, and hands; however, Dr. Evans explained that some wounds could have been caused by a bullet entering and exiting one part of the body, such as the hand, and then reentering another, such as the torso. Dr. Evans confirmed that the gunshot wounds were fatal to Roman. Dr. Evans could not determine whether the shooter acted offensively or defensively, nor in which order Roman suffered his wounds.

Dr. Evans stated that Roman was not wearing a pistol holster anywhere on his body when she performed her examination. Moreover, there was not any major tearing to any of Roman's clothing, except for the holes caused by the bullets. Additionally, Dr. Evans did not find evidence of fibers or tissue underneath Roman's fingernails, the presence of which could indicate a physical confrontation prior or during the shooting.

## E. Hayley Gibbens

Gibbens testified that she met Skaggs in a game room in San Antonio approximately five months before Roman's death. Gibbens explained that the two developed a romantic relationship and ended up living together in a hotel. According to

Gibbens, Skaggs and Roman got into an argument because Roman believed he did not receive his fair share of proceeds from three vehicles that he, Skaggs, and another man stole. That caused Roman to steal one of the vehicles away from Skaggs, which angered Skaggs. Gibbens also stated that Skaggs "always" kept a firearm on himself.

Gibbens explained that Skaggs messaged Roman from her cell phone, asking Roman if he knew where Skaggs was. According to Gibbens, Skaggs told her the purpose was to attempt to get the stolen vehicle back. Eventually, Skaggs and Gibbens set up a time for Roman to pick Gibbens up so that she could disclose their location, allowing Skaggs to follow them. When Roman picked Gibbens up, she had Skaggs's cell phone in her backpack on a call with him so he could hear the conversation. Gibbens disclosed that Skaggs also tracked her location through an app.[3]

Skaggs and Darimont arrived at the hotel and asked Gibbens where Roman was; Gibbens directed them to the general area but explained she was not sure what room. Gibbens described Skaggs's demeanor as "very angry, very upset" at that point. Gibbens claimed that she was on the phone with Darimont while he and Skaggs went to talk to Roman. "[She] didn't hear any arguing or fighting. It was silent. [The n]ext thing [she] heard w[as] four gunshots, at least four go off." After the gunshots, Skaggs "ran around the corner" and told Gibbens, "Let's go."

Gibbens testified that Skaggs broke and threw out the cell phone he had prior to

---

[3] Gibbens was indicted for murder for her role in Roman's shooting—she received a plea bargain agreement in exchange for her testimony. The jury received an accomplice-witness instruction in the charge of the court. *See* TEX. CODE CRIM. PROC. art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.").

the shooting and purchased a new one before his arrest. In the nine days between the shooting and their arrests, Skaggs and Gibbens "moved from hotel to hotel."

### F. Nicholas Darimont

Darimont testified that he was also indicted for murder for his role in Roman's death.[4] Darimont explained that he resided in Arizona and had a "business relationship" with Skaggs.[5] Darimont's business relationship caused him to travel from Arizona to San Antonio on March 15, 2021. Darimont met up with Skaggs at about midnight on March 17 to give Skaggs a ride to the hotel. According to Darimont, once he picked up Skaggs, Skaggs explained they were going to try to locate the vehicle that Roman stole from Skaggs.

Darimont denied being on the phone with Gibbens leading up to the shooting. According to Darimont, he was following Skaggs around the hotel but initially remained at the bottom of the stairs when Skaggs went to the second-story hotel room where Roman was. However, Darimont walked to the room to get Skaggs "before anything bad happen[ed]." Before Darimont reached the room, he heard several gunshots. Darimont denied hearing any arguments or fighting before the gunshots but explained that he was too far away to have heard anything. Darimont stated that it was "less than 15 seconds" from the time Skaggs entered the room to the time he heard gunshots. Darimont stated that Skaggs did not have any bumps or bruises on him after exiting the room.

---

[4] Unlike Gibbens, Darimont had not entered into a plea agreement with the State at the time of Skagg's trial.

[5] It was later revealed through Skaggs's testimony that the "business relationship" was transporting and selling methamphetamine and cocaine.

After the gunshots, Skaggs left the room and told the group, "Let's go." The three got into Darimont's truck and Skaggs "placed a handgun on the dash." Darimont explained that the three went to a convenience store after the shooting so that Skaggs could buy cigarettes. Darimont left San Antonio less than twenty-four hours after the shooting. Darimont acknowledged that he spray-painted his truck from red to black to conceal his vehicle from law enforcement so that he could make it back to Arizona.

**G. Douglas Skaggs**

Skaggs testified that his business relationship with Darimont was actually transporting and selling drugs. It was through his drug dealing that Skaggs met Gibbens, who was an active drug user herself. Skaggs did not explain how he and Roman met but stated the two quickly became friends. Skaggs explained that Roman gave him a 1975 Ford Bronco that was sitting on Roman's property in exchange for some money and work. One morning Skaggs woke up to find the Ford Bronco missing. Roman allegedly called Skaggs and disclosed that he took the Ford Bronco back because he was not satisfied with the original agreement.

Skaggs explained that his threatening text messages to Roman were never meant to be acted upon; rather, he was trying to scare Roman into returning the Ford Bronco. Ultimately, Skaggs's plan to track Gibbens to follow Roman came to fruition. Skaggs and Darimont followed Roman to the hotel. According to Skaggs, he went to the room unarmed—it was Roman who had the gun. When Skaggs entered the room, he asked Roman, "Tito, what's going on man?" Skaggs stated that Roman jumped off the bed as soon as Skaggs spoke, charged him, and held a gun to his throat and said "I'm going to

f'ing kill you" or something to that effect. Skaggs told the jury that he wrestled the gun away from Roman and, when Roman attempted to grab the gun back, the "shooting started happening."[6]

### H. Verdict

The jury found Skaggs guilty of murder and sentenced him to sixty years' confinement. This appeal followed.

## II. Applicable Law and Standard of Review

The penal code provides that deadly force used in self-defense is a defense to prosecution for murder if that use of force is "justified." *See id.* §§ 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter."), 9.31–.33 (setting forth substantive requirements for establishing claim of self-defense or defense of a third person); *Braughton v. State*, 569 S.W.3d 592, 606 (Tex. Crim. App. 2018). Texas Penal Code § 9.31 states that, subject to certain exceptions, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a). A "reasonable belief" in this context is defined as one "that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

A person is justified in using deadly force against another if he would be justified in using force under § 9.31 "when and to the degree the [person] reasonably believes the

[6] Skaggs and his attorney reenacted the purported events for the jury; however, the reenactment is not thoroughly described in the record.

deadly force is immediately necessary . . . to protect [themselves] against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a)(2)(A); *Rogers v. State*, 664 S.W.3d 843, 851–52 (Tex. Crim. App. 2022) ("Section 9.31 lays out the standard for the use of force in self-defense. However, the use of deadly force in defense of a person is governed by [§] 9.32."). "The Penal Code does not require that a defendant intend the death of an attacker in order to be justified in using deadly force in self-defense." *Alonzo v. State*, 353 S.W.3d 778, 783 (Tex. Crim. App. 2011). However, the defendant bears the burden to produce evidence in support of his claim. *Braughton*, 569 S.W.3d at 608 ("The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue."). "By contrast, the State's burden of persuasion 'is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt.'" *Id.* (quoting *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)).

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358, 361 (1970)). When reviewing the sufficiency of the evidence, we "view[] the evidence in the light most favorable to the prosecution" to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319; *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (adopting the standard of review for a sufficiency challenge as set out by *Jackson*). When the factfinder implicitly rejects a defendant's claim of self-defense by finding him guilty,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Braughton*, 569 S.W.3d at 609 (quoting *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)).

When a reviewing court views the evidence in the light most favorable to the verdict, it "is required to defer to the jury's credibility and weight determinations because the jury is the **sole** judge of the witnesses' credibility and the weight to be given their testimony." *Brooks*, 323 S.W.3d at 899. "[A] factfinder may disbelieve some or all of a witness's testimony, even when that testimony is uncontradicted." *Hernandez v. State*, 161 S.W.3d 491, 501 (Tex. Crim. App. 2005).

Unlike uncontradicted testimony, however, a jury generally may not disregard undisputed facts. *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (distinguishing between uncontradicted testimony and undisputed facts, describing undisputed facts as "facts that both parties agree (or assume) are true"). "Although the parties may disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the fact[]finder's choice between them cannot be clearly erroneous.'" *Id.* (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).

"Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Guevara v. State*, 152 S.W.3d

45, 49 (Tex. Crim. App. 2004)). Juries may "draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial." *Hooper*, 214 S.W.3d at 15. If the record supports conflicting inferences, we presume that the factfinder resolved the conflict in favor of the prosecution and defer to that resolution. *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012); *Brooks*, 323 S.W.3d at 899. "However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Hooper*, 214 S.W.3d at 15. "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them" while "[s]peculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* at 16. "[T]he mere existence of an alternative reasonable hypothesis does not render the evidence factually insufficient." *Villarreal Lopez v. State*, 267 S.W.3d 85, 98 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (quoting *Richardson v. State*, 973 S.W.2d 384, 387 (Tex. App.—Dallas 1998, no pet.)).

Constitutional review of the sufficiency of the evidence is measured against the elements of the criminal offense as defined by state law. *Fuller v. State*, 73 S.W.3d 250, 252–53 (Tex. Crim. App. 2002) (citing *Jackson*, 443 U.S. at 324 n.16). However, review of the "sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case." *Garcia*, 367 S.W.3d at 687 (cleaned up) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically correct jury charge "accurately sets out the law and adequately describes the offense for which the defendant was tried without increasing the State's burden of

proof or restricting the State's theories of liability." *Hooper*, 214 S.W.3d at 14 (citing *Malik*, 953 S.W.2d at 240).

## III. Analysis

By a single issue, Skaggs appeals his conviction by arguing the evidence was legally insufficient. More specifically, Skaggs argues that "[b]ecause [his] version of events went unchallenged[,] the jury was not permitted to disregard the undisputed objective facts that . . . supported only one logical inference—[Skaggs] acted in self-defense." In this regard, Skaggs characterizes his "version of events" as "undisputed facts." *See Evans*, 202 S.W.3d at 163. However, Skaggs confuses "undisputed facts" with "uncontradicted testimony." *See id.* The court of criminal appeals succinctly explained the distinction between undisputed facts—which generally may not be disregarded—and uncontradicted testimony—which may be disbelieved:

> For example, a defendant's mother may testify that the defendant was with her in Oshkosh on the night of the murder. Even though the State does not cross-examine the defendant's mother, the jury is not required to believe her uncontradicted testimony. She is, after all, the defendant's mother. On the other hand, facts that both parties agree (or assume) are true . . . are "undisputed facts."

*Id.*; *see Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021).

Here, Skaggs's testimony constitutes uncontradicted testimony rather than undisputed facts. *See Evans*, 202 S.W.3d at 163. The jury was free to disbelieve Skaggs's explanation of the events. *See id.* Moreover, the record contains some evidence supporting the jury's implicit rejection of Skaggs's self-defense testimony. *See Braughton*, 569 S.W.3d at 608. For example, Skaggs's messages threatening to kill Roman in the days prior to the shooting and his plan to follow Gibbens to Roman suggest that Skaggs

intended to kill him. *See id.*; *Borton v. State*, No. 04-22-00255-CR, 2023 WL 5597745, at *5 (Tex. App.—San Antonio Aug. 30, 2023, no pet.) (concluding the jury was free to disbelieve appellant's claim of self-defense and believe witness testimony claiming appellant threatening to shoot the complainant before the shooting). Pizzini's testimony that Roman had cigarettes in one hand and a cell phone in the other contradicts Skaggs's claims that Roman held a pistol to his throat. *See Braughton*, 569 S.W.3d at 608. No witnesses overheard an argument. *See id.* And Skaggs's testimony that he did not have a firearm on him when entering the room was contradicted by Gibbens's testimony that he "always" kept a firearm on him.[7]

Moreover, Skaggs's actions after the shooting could be interpreted as supporting guilt, such as failing to render aid or call for emergency services, throwing out his cell phone, getting rid of the firearm, and fleeing the city to avoid apprehension. *See Patterson v. State*, 606 S.W.3d 3, 27 (Tex. App.—Corpus Christi–Edinburg 2020, pet. ref'd) (looking to appellant's post-murder conduct in assessing the sufficiency of the evidence supporting guilt); *see also Greenwood v. State*, No. 04-21-00313-CR, 2023 WL 2396799, at *5 n.8 (Tex. App.—San Antonio Mar. 8, 2023, no pet.) (mem. op., not designated for publication) ("The jury could have further drawn an inference of guilt based on the evidence at trial showing Greenwood fled the scene and initially disposed of the murder weapon . . . ."). Having reviewed all the evidence presented at trial in a light most favorable to the prosecution, we conclude that there is sufficient evidence to support a rational factfinder's

[7] It is also worth noting that Skaggs had a loaded firearm on him when he was arrested by the United States Marshalls; however, it was determined that the firearm was not the same as the one used to shoot Roman.

rejection of Skaggs's self-defense claim. *See Braughton*, 569 S.W.3d at 609. Skaggs's sole issue is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)

Delivered and filed on the
21st day of March, 2024.